876 F.2d 808
 51 Fair Empl.Prac.Cas. 608,
50 Empl. Prac. Dec. P 39,023
Rose Marie STARRETT, Plaintiff-Appellee and Cross-Appellant,
v.
Robert W. WADLEY, Individually and in his Official Capacity
as Creek County Assessor; and Board of County
Commissioners of Creek County, Oklahoma,
Defendants-Appellants and
Cross-Appellees.
 Nos. 86-2002, 86-2067 and 86-2423.
 United States Court of Appeals,
Tenth Circuit.
 May 22, 1989.
 
 D. Gregory Bledsoe, Tulsa, Okl., for plaintiff-appellee and cross-appellant.
 Keith Ham, Bristow, Okl. (Lantz McClain, Dist. Atty., Sapulpa, Okl., with him on the briefs), for defendants-appellants and cross-appellees.
 Before TACHA, BARRETT, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This is a sexual harassment case brought by a former county employee, Rose Marie Starrett, against her supervisor, the former Assessor for Creek County, Oklahoma, and against the County. After a jury trial, the district court entered judgment for plaintiff on some of her claims, and both sides have appealed. We affirm in part, reverse in part, and remand.
 
 
 2
 Defendants raise the following issues on appeal: (1) whether 42 U.S.C. Sec. 1983 provides an independent remedy for sexual harassment separate from that provided by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Secs. 2000e to 2000e-17; (2) whether plaintiff presented adequate proof of a violation of her constitutional rights; (3) whether the County can be held liable under Section 1983 for the Assessor's acts; (4) whether the district court erred in excluding evidence regarding plaintiff's unemployment compensation application; (5) whether the damages were excessive; and (6) whether the award of attorney's fees was excessive.
 
 
 3
 Plaintiff has cross-appealed, raising the following issues: (1) whether the district court erred in holding that plaintiff was a member of the Assessor's personal staff and, hence, exempt from Title VII's coverage; (2) whether the district court should have ordered reinstatement or front pay; (3) whether the district court erred in its award of post-judgment interest; and (4) whether the award of attorney's fees was inadequate.
 
 
 4
 The underlying facts relevant to this appeal are largely undisputed. Plaintiff Rose Marie Starrett worked as a deputy assessor in the Creek County Assessor's office from March 1982 to October 1983. Her principal duty was to inspect and value real property in Creek County. Her supervisor, defendant Robert W. Wadley, had been elected to his post as County Assessor.
 
 
 5
 During plaintiff's one-and-a-half year tenure with the Assessor's office, Wadley repeatedly made sexual advances toward plaintiff and other female employees, often while he appeared to be intoxicated. Those advances included propositioning plaintiff, requesting that she meet him at his house or at other secluded locations, making obscene gestures toward her, and pinching her on the buttocks.
 
 
 6
 After plaintiff had spurned his advances, Wadley became hostile towards plaintiff and began scrutinizing her work more closely than the work of the other employees. He also repeatedly told her that at least one member of the office might have to be terminated for budgetary reasons, implying that it might be she.
 
 
 7
 Plaintiff complained first to Wadley, then to Wadley's attorney, and then to the Chairman of the Board of County Commissioners about Wadley's sexual harassment and his drinking problems.[1] After those complaints, Wadley continued his threats about terminating plaintiff.
 
 
 8
 Eventually plaintiff contacted her own lawyer who wrote a letter to Wadley stating that Wadley's sexual harassment of plaintiff violated Title VII and warning Wadley not to retaliate against her for asserting any right protected by federal law. Approximately two months after plaintiff's lawyer sent the letter to Wadley, Wadley terminated plaintiff's employment for purported "budgetary" reasons. When Wadley terminated her employment, he told her in a telephone conversation, which was overheard by co-workers, "I don't like you going to an attorney." (Tr. at 120.)
 
 
 9
 Plaintiff subsequently filed suit in the United States District Court for the Northern District of Oklahoma against Wadley and the County.[2] She alleged that defendants had violated Section 1983 by acting under color of state law to violate her First Amendment right to freedom of speech and her Fourteenth Amendment right to equal protection of the laws.[3] Plaintiff further alleged that defendants had violated Title VII.[4] Plaintiff also brought pendent state claims for intentional infliction of emotional distress, wrongful termination, and breach of contract.[5]
 
 
 10
 Plaintiff's Section 1983 claims were tried to a jury and her Title VII claims were tried to the district court. The jury rendered a verdict in favor of plaintiff and against defendants for $75,000. The district court entered judgment in that amount plus interest. The district court also awarded plaintiff $84,004 in attorney's fees and $2,391 in expenses. The district court denied plaintiff any recovery under Title VII, holding that plaintiff was employed as part of Wadley's "personal staff" and thus was exempt from Title VII's coverage pursuant to 42 U.S.C. Sec. 2000e(f). The court also ruled against the County on its counterclaim against plaintiff for $14,895.26 in back wages.
 
 
 11
 Wadley in his individual capacity has not appealed. (Doc. 263, Amended Notice of Appeal.) Thus, the judgment is final as to him. The County and Wadley "in his official capacity" have appealed, but they are essentially the same entity. Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985) ("[A] judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents"). See also, e.g., McGhee v. Draper, 639 F.2d 639, 642 (10th Cir.1981) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.") (quoting Monell v. Dept. of Social Services, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)). Therefore, despite the fact that the County and Wadley "in his official capacity" filed separate, complementary briefs in this appeal, the appeal effectively is between only two parties: the County and plaintiff.[6]
 
 I. SECTION 1983 ISSUES
 A. Concurrent Application Of Title VII
 
 12
 The County argues that the district court should not have submitted plaintiff's Section 1983 claims to the jury because a Section 1983 claim cannot be premised upon a Title VII violation. In the County's words, "[b]y enacting Title VII Congress created a specific administrative process and remedial framework through which individuals subjected to sexual harassment may seek relief," and the framework "may not be bypassed by prosecuting a Title VII action under the guise of a Sec. 1983 claim." (Wadley Br. at 11.)
 
 
 13
 Although the County's assertion is technically correct, it is beside the point. It is true that a right created solely under Title VII cannot serve as the basis for an independent remedy under Section 1983, lest Congress' prescribed remedies under Title VII be undermined. See Long v. Laramie County Community College Dist., 840 F.2d 743, 752 (10th Cir.) (right to be free from retaliation for filing a discrimination charge, created by Title VII, cannot be sole basis of Section 1983 action), cert. denied, --- U.S. ----, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988); Tafoya v. Adams, 816 F.2d 555, 558 (10th Cir.) (same), cert. denied, --- U.S. ----, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987); cf. Great American Fed. Savings & Loan Ass'n. v. Novotny, 442 U.S. 366, 375-76, 99 S.Ct. 2345, 2350-51, 60 L.Ed.2d 957 (1979) (rights created by Title VII cannot be the basis for an action under 42 U.S.C. Sec. 1985(3)).
 
 
 14
 However, that principle does not help the County here because plaintiff's Section 1983 claim is not predicated upon a violation of Title VII, but rather upon a violation of the First and Fourteenth Amendments. If a plaintiff can show a constitutional violation by someone acting under color of state law, then the plaintiff has a cause of action under Section 1983, regardless of Title VII's concurrent application.[7] See Owens v. Rush, 654 F.2d 1370, 1380 (10th Cir.1981) ("Title VII did not impair in any way [plaintiff's] independent, substantive rights created by the First and Fourteenth Amendments.... '[S]ubstantive rights conferred in the 19th Century were not withdrawn, sub silentio, by the subsequent passage of the modern statutes.' ") (quoting Novotny, 442 U.S. at 377, 99 S.Ct. at 2351); Day v. Wayne County Bd. of Auditors, 749 F.2d 1199, 1205 (6th Cir.1984) ("Where an employee establishes employer conduct which violates both Title VII and rights derived from another source--the Constitution or a federal statute ... the claim based on the other source is independent of the Title VII claim, and the plaintiff may seek the remedies provided by Sec. 1983 in addition to those created by Title VII."); cf. Meade v. Merchants Fast Motorline, Inc., 820 F.2d 1124, 1127 (10th Cir.1987) ("plaintiff may properly pursue his cause of action under Sec. 1981 for private employment discrimination despite the applicability of Title VII to the same conduct").[8]
 
 
 15
 Therefore, the district court properly submitted plaintiff's Section 1983 claim to the jury.
 
 B. Existence Of Constitutional Violations
 
 16
 The County further argues that there was not sufficient evidence of a constitutional violation here. We disagree.
 
 
 17
 We hold that sexual harassment of the sort alleged by plaintiff can violate the Fourteenth Amendment right to equal protection of the laws. In so holding, we follow the Supreme Court's intimations on the subject and join the ranks of other circuits that have addressed the issue. E.g., Bohen v. City of East Chicago, 799 F.2d 1180, 1185 (7th Cir.1986) ("Sexual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment."); Headley v. Bacon, 828 F.2d 1272, 1274-75 (8th Cir.1987) (permitting Section 1983 claim for sexual harassment in addition to Title VII claim); cf. Davis v. Passman, 442 U.S. 228, 234-35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979) (sex discrimination can violate right to equal protection); Meritor Savings Bank v. Vinson, 477 U.S. 57, 73, 106 S.Ct. 2399, 2409, 91 L.Ed.2d 49 (1986) (sexual harassment can constitute sex discrimination for Title VII purposes); see also Long v. Laramie County Community College Dist., 840 F.2d 743, 752-53 (10th Cir.) (allowing plaintiff to proceed "under Secs. 1983 and 1985 on the sexual harassment theory" despite plaintiff's failure to prove Title VII claim for same conduct), cert. denied, --- U.S. ----, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988).
 
 
 18
 The evidence here was sufficient for the jury to conclude that Wadley's conduct toward plaintiff deprived her of the right to equal protection of the laws. Plaintiff presented evidence that Wadley had made various sexual advances toward her. On repeated occasions, Wadley asked plaintiff to meet him during business hours at his house or at other secluded locations. (E.g., Tr. at 78-79, 83.) On one occasion, he asked her to go with him to a motel. (Tr. at 81-82.) At a hotel business reception, Wadley pinched plaintiff's buttocks with his full hand. (Tr. at 84-85.) Later that night, at a dance club, he put his arm on plaintiff's leg and invited her to his hotel room. (Tr. at 87.) Wadley often made obscene gestures to plaintiff during working hours. (E.g., Tr. at 91-93, 100.) Plaintiff also presented evidence that Wadley had sexually harassed other female employees in the office. (E.g., Tr. at 564-66; 705-09.)
 
 
 19
 In addition, plaintiff presented evidence that Wadley's treatment of her changed after she spurned his advances and complained about his harassment. Wadley began scrutinizing her work more carefully than the work of other employees, singling out her work for special review and making changes on her work cards. (Tr. at 97, 102-03.) He also became hostile to plaintiff and began hinting that she might be terminated. (Tr. at 98-99, 103.) Wadley ultimately made good on his threats and fired plaintiff.
 
 
 20
 Based upon the evidence summarized above, we hold that the jury reasonably could have concluded that Wadley's conduct toward plaintiff discriminated against her because of her sex and thereby deprived her of the right to equal protection of the laws.[9]
 
 
 21
 The evidence here also was sufficient to support the jury's conclusion that plaintiff "established her claim of retaliation in the exercise of her First Amendment right of freedom of expression." (Doc. 156, Special Interrogatory # 2.)
 
 
 22
 The Supreme Court has established a two-part test for evaluating the First Amendment rights of public employees. Under this test, courts must determine (1) whether the plaintiff's statements can be "fairly characterized as constituting speech on a matter of public concern," and (2) whether the "interests of the [employee], as a citizen, in commenting upon matters of public concern" outweigh the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick v. Myers, 461 U.S. 138, 142, 146, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). See also Conaway v. Smith, 853 F.2d 789, 795-96 (10th Cir.1988); Koch v. City of Hutchinson, 847 F.2d 1436, 1440 (10th Cir.) (en banc), cert. denied, --- U.S. ----, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).
 
 
 23
 With regard to the first part of the test, an issue is a matter of "public concern" if it is a "matter of political, social, or other concern to the community." Connick, 461 U.S. at 146, 103 S.Ct. at 1689. However, a public employee's statements about personal grievances are not automatically matters of public concern just because the employer is a governmental entity. A public employee's disputes and grievances may be private matters with no relevance to public interests, and speech concerning those private matters would not be protected by the Constitution:
 
 
 24
 [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.
 
 
 25
 Connick, 461 U.S. at 147, 103 S.Ct. at 1690.
 
 
 26
 Among other factors, "[c]ourts have focused on the motive of the speaker in analyzing whether the speech qualifies as a matter of public concern, i.e., whether the speech was calculated to disclose misconduct or dealt with only personal disputes and grievances with no relevance to the public interests." Conaway, 853 F.2d at 796 (emphasis in original).
 
 
 27
 In general, whether an employee's speech is a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-148, 103 S.Ct. at 1690. The ultimate issue of whether an employee's speech has protected status is an inquiry "of law, not fact." Id. at 148 n. 7, 103 S.Ct. at 1690 n. 7.
 
 
 28
 Here, plaintiff contends that she was fired because she "spoke out" about two matters of alleged public concern: (1) "Wadley's sexual harassment of [her] and the retaliation that was occurring to her," and (2) her "concern about the County Assessor's drinking problems and the proper functioning of the office." (Starrett Br. at 19.)
 
 
 29
 We need not decide whether plaintiff's complaints about Wadley's harassing conduct were matters of public concern because defendants never objected to the district court's jury instruction on the issue. The jury was instructed that plaintiff's expressions concerning sexual harassment and related retaliation were matters of public concern. Given defendants' failure to object the district court's instruction, we accept for the purposes of this case that plaintiff's expressions were matters of public concern.[10]
 
 
 30
 With regard to plaintiff's complaints concerning Wadley's alleged alcohol problems, the record is less clear. Defendants may have objected to the portion of the instruction that related to Wadley's alleged abuse of alcohol on the job. See Tr. at 1248 (Wadley's attorney: "I am still troubled by the concept that the comments of the nature that were made here with respect to the use of alcohol ... are constitutionally protected expression of free speech...."); 1199-1200.
 
 
 31
 Plaintiff testified that she spoke out about Wadley's alcohol problems on repeated occasions. First, she complained directly to Wadley about his "drinking problem" and its effect on the office. (Tr. at 110; see also id. at 94-95.)[11] Second, she sought assistance from Wadley's lawyer in correcting Wadley's drinking problem: "I told him about Bob coming to work very intoxicated.... I told him about being concerned about Bob's drinking." (Tr. at 112-13.) The lawyer told her that he "would talk to Mr. Wadley and some of the other representatives and get back" with her. (Tr. at 114.) The next day, plaintiff and some other women from the office went to the lawyer and complained further about "[t]he drinking problem." (Id.) Third, plaintiff went to the Chairman of the County Commissioners and again complained "about Bob's drinking, and that he was ... working very intoxicated." (Tr. at 101.)
 
 
 32
 Plaintiff testified that her motive in speaking out about Wadley's drinking problems was not purely personal, but stemmed from her concerns as a member of the community:
 
 
 33
 I talked to [Wadley] about my concern for him as a person, for him as Creek County Assessor, his drinking problem. My concern was Creek County.
 
 
 34
 ....
 
 
 35
 I went to [Wadley's lawyer] as a concerned employee or concerned citizen to talk to him about some of these problems to see if he could talk to Mr. Wadley and see if some of them couldn't be worked out.
 
 
 36
 (Tr. at 110, 112.)
 
 
 37
 We agree with the district court that plaintiff's statements about Wadley's alcohol problems were matters of public concern. As we held in Conaway, "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import." Conaway, 853 F.2d at 796. See also Connick, 461 U.S. at 148, 103 S.Ct. at 1691 ("actual or potential wrongdoing or breach of public trust" by a public official constitutes a matter of public concern). Plaintiff's statements about Wadley's drinking problems fall into that category. Cf. Okla.Stat.Ann. tit. 22 Sec. 1181 (West 1988) (declaring "habitual drunkenness" to be ground for involuntary removal of elected officials).
 
 
 38
 We also agree with the district court that plaintiff's interests in free speech outweighed Wadley's interests in stifling her comments. Defendants have not met their burden of showing that restriction of plaintiff's comments was "necessary to prevent the disruption of official functions or to insure effective performance by the employee." Conaway, 853 F.2d at 797 (quoting Wren v. Spurlock, 798 F.2d 1313, 1318 (10th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987)).
 
 
 39
 Our review of the record satisfies us that there was sufficient circumstantial evidence to support the jury verdict that Wadley fired plaintiff because of her exercise of her First Amendment rights. The jury expressly found by way of a special interrogatory that plaintiff had established her First Amendment claim. Therefore, we affirm the district court's judgment that Wadley's conduct deprived plaintiff of her constitutional rights and entitled her to a remedy under Section 1983.[12]C. Liability Of County
 
 
 40
 The County argues that even if Wadley's acts violated Section 1983, the County was not responsible for them. We affirm the finding of County liability under Section 1983 for Wadley's act of firing plaintiff, but we reverse the finding of County liability for Wadley's other acts of harassment. Consequently, we remand for a redetermination of damages on the Section 1983 claim.[13]
 
 
 41
 In Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities can be sued as "persons" under 42 U.S.C. Sec. 1983. However, the Court held that municipalities cannot be held liable under Section 1983 on a respondeat superior theory for merely employing a tortfeasor. Id. at 691, 98 S.Ct. at 2036. Rather, municipalities are subject to liability only for their official policies or customs:
 
 
 42
 [I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Sec. 1983.
 
 
 43
 Id. at 694, 98 S.Ct. at 2037-38.
 
 
 44
 The Court in Monell distinguished between municipal policy and municipal custom. It described municipal policy as a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers." Id. at 690, 98 S.Ct. at 2036. It described municipal custom as "persistent and widespread ... practices of ... officials." Id. at 691, 98 S.Ct. at 2036 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)).
 
 
 45
 Since Monell, the Supreme Court has explained that a municipality can be liable under Section 1983 for the acts of a municipal official only when the official possesses "final policymaking authority" to establish municipal policy with respect to the acts in question. Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 1300, 89 L.Ed.2d 452 (1986) (plurality); City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality). The Court in Pembaur and Praprotnik emphasized that municipal liability is limited to "acts that are, properly speaking, acts 'of the municipality'--that is, acts which the municipality has officially sanctioned or ordered." Pembaur, 475 U.S. at 480, 106 S.Ct. at 1298; see also Praprotnik, 108 S.Ct. at 924.
 
 
 46
 The mere exercise of discretion by a county official is not sufficient, by itself, to generate municipal liability:
 
 
 47
 The fact that a particular official--even a policymaking official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. [Citation omitted.] The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.
 
 
 48
 Pembaur, 475 U.S. at 481-83, 106 S.Ct. at 1299-1300; see also Praprotnik, 108 S.Ct. at 925. However, if a county official has been delegated the power to make final policy in an area of the county's business, then the official's acts in that area are the acts of the county. Pembaur, 475 U.S. at 482-83, 106 S.Ct. at 1299; Praprotnik, 108 S.Ct. at 924.
 
 
 49
 Whether an official has final policymaking authority in a particular area is a question of state law. Pembaur, 475 U.S. at 483, 106 S.Ct. at 1300; Praprotnik, 108 S.Ct. at 924. Here, we conclude that Wadley's act of firing plaintiff was an act of the County because Wadley had final authority to set employment policy as to the hiring and firing of his staff. See Pembaur, 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12 ("[I]f the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.").[14] Although Creek County officially is represented by its Board of County Commissioners, Okla.Stat.Ann. tit. 19 Secs. 3, 4 (West 1988), the record does not indicate that the Board established any relevant employment policies or regulations concerning the Assessor's staff. Moreover, aggrieved staff members such as plaintiff had no meaningful avenues of review of Wadley's employment decisions. The County points out that the Board did have the power to institute removal proceedings against Wadley for "willful neglect of duty," "oppression in office," "willful maladministration," and "habitual drunkenness," Okla.Stat.Ann. tit. 22 Secs. 1181, 1194 (West 1988), and that the Board eventually exercised that power. However, we find that the power of ouster was too general to eliminate Wadley's status as an official policymaker concerning employment practices in his office.
 
 
 50
 Indeed, the Chairman of the Board of County Commissioners testified at trial that he "did not think we had ... control over Mr. Wadley's office. He was an elected official just as we were. He could handle his personnel, you know, more or less how he wanted to handle them." (Tr. at 819.)
 
 
 51
 We hold that Wadley's termination of plaintiff's employment was a final policy decision for the County. Wadley could not have fired plaintiff except for the fact that the County vested him with that authority, and Wadley was acting in his official capacity for the County when he performed the act. Because the County had delegated to Wadley the power to establish final policy concerning hiring and firing personnel within his department, the County is liable for Wadley's conduct in that regard.[15]
 
 
 52
 By contrast, we do not believe that Wadley's acts of harassment of plaintiff, separate from the firing, constituted official policy, and therefore we conclude that it was error for the district court to deny the County's motion for judgment notwithstanding the verdict on this issue.[16] Whereas Wadley's ability to hire and fire necessarily carried with it official authority and sanction, the other acts of sexual harassment complained of here were private rather than official acts. Those acts did not concern any official terms of employment, such as job title or description, salary levels, or other conditions that Wadley could establish only because the County delegated final policy authority over those matters to him. Rather, Wadley's acts of harassment were personal in nature without any indicia of being "officially sanctioned or ordered." Pembaur, 475 U.S. at 480, 106 S.Ct. at 1298. Although Wadley undeniably bears personal responsibility and liability for those acts, the County should not be liable for them unless they were so widespread and pervasive as to establish a "custom" within his office. We will address custom below but conclude here that Wadley's acts of personal harassment of plaintiff did not rise to the level of official County "policy."
 
 
 53
 To analogize to a distinction that has developed in Title VII cases, Wadley's acts of sexual harassment, other than the act of termination, did not constitute what some courts have termed "quid pro quo" sexual harassment. "Quid pro quo sexual harassment occurs when an employer alters an employee's job conditions as a result of the employee's refusal to submit to sexual demands." Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1315 (11th Cir.1989) (addressing issue of company's liability under Title VII for supervisor's acts of sexual harassment). See also Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1413 (10th Cir.1987); Crimm v. Missouri Pacific Railroad Co., 750 F.2d 703, 710 (8th Cir.1984); Katz v. Dole, 709 F.2d 251, 254-55 (4th Cir.1983); Henson v. City of Dundee, 682 F.2d 897, 908 (11th Cir.1982).
 
 
 54
 Although there was evidence that Wadley was hostile to plaintiff and singled her work out for special review after she rejected his sexual advances, he did not materially alter her employment duties or status prior to the termination. Any person in an employment situation, whether a supervisor or a subordinate, can create a hostile working environment. But it is only by using the power of his office to establish employment policy that a final policymaker can establish municipal "policy."
 
 
 55
 Even if acts of harassment do not rise to the level of "official policy," it is still possible that a widespread and persistent practice of sexual harassment in a municipal department could constitute the "custom" of a municipality. However, the evidence in this case did not demonstrate that a widespread practice existed. (E.g., Tr. at 485, 866, 876, 885, 932, 937, 1086, 1092.) Instead, the evidence suggests that Wadley engaged in isolated and sporadic acts of sexual harassment directed at a few specific female members of his staff. There is no indication that sexual harassment by others in the office was tolerated or occurred. The sole evidence related to Wadley's personal behavior, usually when he appeared to be intoxicated. We find that the evidence was insufficient to establish that the Creek County Assessor's Office had a "persistent and widespread practice[ ]" of permitting sexual harassment or that sexual harassment was a "[d]eeply embedded traditional way[ ]" of operating in the office. Monell, 436 U.S. at 691 & n. 56, 98 S.Ct. at 2036 & n. 56. Indeed, as we noted above, the County Commissioners ultimately began ouster proceedings against Wadley for his conduct, and Wadley resigned shortly thereafter. (Young Aff., Doc. 201.)
 
 
 56
 In light of our disposition of this issue, we are compelled to vacate the damage award against the County because some of the award may have been based upon prior acts of sexual harassment other than the termination. Accordingly, we remand for a determination of the amount of damages against the County stemming solely from the unlawful termination.
 
 II. TITLE VII ISSUES
 A. Personal Staff Exemption
 
 57
 In her cross-appeal, plaintiff contends that the district court erred in ruling that she fell within Title VII's "personal staff" exemption, 42 U.S.C. Sec. 2000e(f).[17] We agree.
 
 
 58
 Title VII exempts from its definition of employee "any person chosen by [an elected] officer to be on such officer's personal staff" or the officer's "appointee on the policy making level" or the officer's "immediate adviser with respect to the exercise of the constitutional or legal powers of the office." Id.[18] The district court dismissed plaintiff's Title VII claim because it found that plaintiff was a member of Wadley's personal staff. In support of its conclusion, the district court noted that plaintiff was under Wadley's supervision, she worked closely with Wadley, Wadley could terminate her at will, Wadley periodically would accompany her in her field assessment work, and she often reported directly to Wadley. (November 27, 1985 Findings at p. 3.)
 
 
 59
 The legislative history of Sec. 2000e(f) reveals that "Congress intended the [personal staff] exemption to be narrowly construed." Anderson v. City of Albuquerque, 690 F.2d 796, 800 (10th Cir.1982). The House and Senate conference committee report on this section provides, in pertinent part:
 
 
 60
 It is the intention of the conferees to exempt elected officials and members of their personal staffs, and persons appointed by such elected officials as advisors or to policymaking positions at the highest levels of the departments or agencies of State or local governments, such as cabinet officers, and persons with comparable responsibilities at the local level. It is the conferees [sic] intent that this exemption shall be construed narrowly. Also, all employees subject to State or local civil service laws are not exempted.
 
 
 61
 1972 U.S.Code Cong. & Ad.News 2137, 2180. As we have previously observed, it appears that Congress wanted the exemption "to apply only to those individuals who are in highly intimate and sensitive positions of responsibility on the staff of the elected official." Owens v. Rush, 654 F.2d 1370, 1375 (10th Cir.1981). See also 118 Cong.Rec. at 4492-93 (1972) (The purpose of the personal staff exemption was "to exempt from coverage those who are chosen by the Governor or the mayor or the county supervisor, whatever the elected official is, and who are in a close personal relationship and an immediate relationship with him. Those who are his first line of advisers.").
 
 
 62
 Here, plaintiff was one of several lower-level deputies in the County Assessor's office. The record reveals that plaintiff's salary was approximately $10,000 per year. Oklahoma law required Wadley to appoint a "first or chief deputy" to act for him in his absence, and he did so. Okla.Stat.Ann. tit. 19 Sec. 180.65(B) (West 1988). But that person was not plaintiff. Most important, Wadley himself testified that plaintiff worked as one of the office's "field personnel" and was not a close personal advisor to him:
 
 
 63
 Q. Was she a close personal adviser--and I'm talking about Rose Starrett--to you in the operation of the office?
 
 
 64
 A. Advised me of what to do?Q. Yes.
 
 
 65
 A. No, sir.
 
 
 66
 (Tr. at 44.)
 
 
 67
 Based upon our review of the record, we conclude that plaintiff did not "formulate policy or advise [Wadley] so as to create the immediate and personal relationship" that is required for the "narrow exemption intended by Congress." Anderson, 690 F.2d at 801. See also, e.g., United States v. Gregory, 818 F.2d 1114, 1117 (4th Cir.) (road deputy was not a member of sheriff's personal staff), cert. denied, --- U.S. ----, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987); Goodwin v. Circuit Court of St. Louis County, 729 F.2d 541, 548 (8th Cir.1984) (state court hearing officer was not an immediate adviser exempt from Title VII's coverage).
 
 
 68
 Therefore, we reverse the district court's dismissal of plaintiff's Title VII claims and we remand for further proceedings. If the district court ultimately finds a Title VII violation, then the district court should address plaintiff's request for reinstatement or front pay. See, e.g., Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945, 956-57 (10th Cir.1980) (front pay may be part of appropriate equitable relief under Title VII).[19]
 
 B. Statute of Limitations
 
 69
 The County asserts in its reply brief that some of plaintiff's Title VII claims should be barred because of the time limits contained in 42 U.S.C. Sec. 2000e-5. Under that section, Title VII claims must be brought within 240 days, which can under some circumstances be extended to 300 days, after the alleged discriminatory employment practice. Smith v. Oral Roberts Evangelistic Assn., 731 F.2d 684, 689 (10th Cir.1984).
 
 
 70
 With regard to plaintiff's claim under Title VII that Wadley illegally terminated her employment because she had rejected his sexual advances, the district court properly ruled that the claim was timely. (Tr. at 1119.) The parties stipulated that plaintiff filed a written sex discrimination charge with both the Oklahoma Human Rights Commission and the federal Equal Employment Opportunity Commission approximately 25 days after plaintiff's employment was terminated, well within Title VII's limitations period.
 
 
 71
 The more difficult issue is whether plaintiff can recover under Title VII for Wadley's earlier acts of sexual harassment, separate and apart from the termination. At trial, plaintiff's attorney conceded that, other than the termination itself, there were no "significant acts of sexual harassment" by Wadley in the 300 days before the termination. (Tr. at 77.) Thus, to the extent that plaintiff asserts claims for prior misconduct that is separate from the eventual termination, those claims are barred under Title VII. However, plaintiff at trial argued that Wadley's prior acts were not separate from the termination, but rather were part of a continuing course of sex discrimination toward plaintiff that culminated in plaintiff's firing.
 
 
 72
 Because the "continuing violation" issue has not been briefed on appeal, we leave it for the district court to address on remand. Compare Rich v. Martin Marietta Corp., 522 F.2d 333, 348 n. 15 (10th Cir.1975) (plaintiff seeking injunctive relief based on "a continuing violation of Title VII may file charges with the EEOC at any time during which the alleged continuing violation has taken place") with United Air Lines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences."). See generally Perez v. Laredo Junior College, 706 F.2d 731, 733-34 (5th Cir.1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984); Serpe v. Four-Phase Systems, Inc., 718 F.2d 935, 937 (9th Cir.1983).
 
 III. OTHER ISSUES
 A. Exclusion Of Evidence
 
 73
 The County asserts that the district court improperly excluded evidence of a purported admission by plaintiff in her application for unemployment insurance. The County contends that the application form shows that plaintiff "voluntarily left her employ due to lack of work," rather than harassment. (Wadley Br. at 16.) We review the district court's exclusion of this evidence under an abuse of discretion standard. United States v. Alexander, 849 F.2d 1293, 1301 (10th Cir.1988).
 
 
 74
 We agree with the district court that the exclusion of the evidence was proper and was engendered by the County's own conduct at trial. Plaintiff had made a motion in limine to exclude any reference to the receipt of unemployment compensation under the collateral source rule. During trial, defendants' counsel accepted plaintiff's views on the collateral source rule and agreed not to introduce or refer to any documents, such as tax returns and W-2 forms, indicating plaintiff's receipt of unemployment compensation. (Tr. at 282, 285, 343.)
 
 
 75
 But during the County's cross-examination of plaintiff, its lawyer asked her, in front of the jury: "And when you applied for unemployment compensation, is there a form that is filled out...." (Tr. at 342.) The County's stated purpose for seeking introduction of the form was to show that it contained a purported admission about why plaintiff was no longer employed. Plaintiff's counsel immediately objected to the question and, outside the jury's presence, requested a mistrial. The district court denied the motion for a mistrial, but understandably was upset with the County's trial counsel: "It may very well be [an] admission against interest, but it would be sure nice if you had come up here and talked to this court about it before you blurted out unemployment insurance.... If you had come up and discussed it with this court, we might be able to skin this cat without talking about unemployment insurance." The district court then sustained plaintiff's objection and told the County's lawyer to go on to another point. (Tr. at 342-45.) Given the circumstances, we see no prejudicial error in the district court's handling of the matter. Cf. E.E.O.C. v. Sandia Corp., 639 F.2d 600, 625-26 (10th Cir.1980) (unemployment compensation is collateral and need not be offset against backpay damages in action under Age Discrimination in Employment Act).
 
 
 76
 The district court subsequently revisited the issue and examined the text of the unemployment compensation application. The district court noted that in one corner of the form, under "Reasons for Leaving," a box was checked saying "lack of work." But at the bottom of the form, in a space provided for additional information, plaintiff recited at length that she believed that she had been terminated in "retaliation [for] a claim I have for harassment and discrimination." (Tr. at 923-24.) The district court concluded that the information on the form cut both ways and, consequently, that its slight impeachment value was outweighed by the danger of jury confusion: "I just think it will be a bit of impeachment that won't advance the ball here in any way and for that reason, even though it were admissible, under Federal Rule of Evidence 403, I think it will cause confusion that we needn't inject in this lawsuit." (Tr. at 925-26.)
 
 
 77
 We agree with the district court's holding that the probative value of the proposed exhibit was minimal and that the value was outweighed by the danger of confusing the jury about the existence of unemployment compensation. The decision to exclude the exhibit was not an abuse of discretion. See Whiteley v. OKC Corp., 719 F.2d 1051, 1057 (10th Cir.1983) (trial court has the discretion to exclude evidence when it finds that the danger of prejudice outweighs the probative value of the evidence).
 
 B. Damages
 
 78
 The County argues that the jury's compensatory damage award of $75,000 in this case is excessive. That argument is moot in light of our decision to vacate the damage award against the County and to remand for a new damage trial.
 
 
 79
 In her cross-appeal, plaintiff argues that the district court erred in denying her reinstatement or front pay. After the jury returned a verdict for plaintiff under Section 1983 for $75,000, plaintiff moved the district court for equitable relief in the form of reinstatement or front pay. The district court denied the motion, holding that (1) reinstatement and front pay are not mandatory remedies under Section 1983; (2) plaintiff found other employment soon after her termination from the Assessor's office; (3) reinstatement would generate hostilities at the office; and (4) the award of $75,000 made plaintiff whole. (June 18, 1986 Order at pp. 10-11.)
 
 
 80
 Regarding the denial of reinstatement, we agree with plaintiff that reinstatement usually will be granted when a plaintiff prevails in a wrongful discharge case brought under Section 1983. See, e.g., Reeves v. Claiborne County Bd. of Education, 828 F.2d 1096, 1101 (5th Cir.1987) ("Reinstatement is also normally an integral part of the remedy for a constitutionally impermissible employment action."); Allen v. Autauga County Bd. of Education, 685 F.2d 1302, 1305 (11th Cir.1982) ("[R]einstatement is a basic element of the appropriate remedy in wrongful employee discharge cases and, except in extraordinary cases, is required"). However, plaintiff here submitted an affidavit from a psychologist with her motion for reinstatement stating that reinstatement was not appropriate at that time and would be detrimental to plaintiff's health. (Doc. 176 attachment.) In light of the affidavit of plaintiff's own expert, we conclude that the district court did not abuse its discretion in denying plaintiff's request for reinstatement. Cf. Fitzgerald v. Sirloin Stockade, Inc., 624 F.2d 945, 957 (10th Cir.1980) (denial of reinstatement was appropriate in a Title VII case where there was an atmosphere of hostility).
 
 
 81
 As for the denial of front pay, we do not believe that the district court abused its discretion in denying front pay under Section 1983. A front pay award is "discretionary with the trial court." Dillon v. Coles, 746 F.2d 998, 1006 (3d Cir.1984). Although front pay sometimes is appropriate when reinstatement is not possible, it is not a mandatory remedy. Shore v. Federal Express Corp., 777 F.2d 1155, 1159 (6th Cir.1985). Here, the district court found that front pay was not appropriate because (1) plaintiff found employment almost immediately after leaving her job at the Assessor's office, and (2) plaintiff was "made whole" by the jury's award of $75,000. (June 18, 1986 Order at 10-11.) We conclude that those reasons were sufficient to support the district court's denial of front pay. However, the district court on remand has discretion to revisit the front pay issue if warranted by changes in the ultimate damage award or other developments.
 
 C. Attorney's Fees
 
 82
 The district court awarded plaintiff attorney's fees of $84,004 pursuant to 42 U.S.C. Sec. 1988.[20] The County contends that this award of attorney's fees was excessive. It argues that the district court erred in failing to reduce plaintiff's attorney's fees in light of the court's dismissal of plaintiff's Title VII claim and plaintiff's abandonment of her state tort claims. We disagree.
 
 
 83
 First, as discussed above, plaintiff's Title VII claim should not have been dismissed. Thus, attorney's fees for the time spent on the Title VII claim were appropriate. Second, a fee award need not be reduced merely because a plaintiff failed to prevail on every claim raised in a lawsuit, especially where, as here, the claims all arise out of a common set of facts. Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). An award of attorney's fees is within the discretion of the district court, who is in a better position than an appellate court to determine the amount of effort expended and the value of the attorney's services. Id. at 437, 103 S.Ct. at 1941; Headlee v. Bowen, 869 F.2d 548, 551 (10th Cir.1989); Brown v. Phillips Petroleum Co., 838 F.2d 451, 453 (10th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). We conclude that the district court did not abuse its discretion in refusing to reduce plaintiff's award of attorney's fees.[21]
 
 
 84
 In her cross-appeal, plaintiff argues that a higher hourly rate should have been applied to the fees of one of plaintiff's attorneys. We disagree. In this case, a magistrate recommended to the district court that plaintiff's attorney Celia K. Skrivanek should receive attorney's fees calculated at $100 per hour in light of her experience and the prevailing rates in the area. (Feb. 10, 1986 Finding and Recommendation at pp. 8-9.) The district court rejected the magistrate's suggestion, awarding Ms. Skrivanek only $85 per hour. The district court based its decision on the fact that $85 per hour was Ms. Skrivanek's standard billing rate and because the district court concluded that $85 per hour was "just and adequate compensation in this case." (June 18, 1986 Order at p. 6.) We do not believe that the district court's decision was an abuse of discretion. Although attorney's fees under 42 U.S.C. Sec. 1988 generally should be calculated according to the prevailing market rates in the relevant community, Blum v. Stenson, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), the district court properly considered Ms. Skrivanek's ordinary billing rate as a relevant factor when determining the prevailing market rate for her particular services, Ramos v. Lamm, 713 F.2d 546, 555 (10th Cir.1983). We also find no abuse of discretion in the district court's refusal to enhance plaintiff's attorney's fees.
 
 D. Interest
 
 85
 Plaintiff argues that the district court improperly delayed the accrual of interest on the award of attorney's fees. The court entered a judgment awarding $84,004 in fees on June 8, 1986, but the judgment stated that the interest was not to begin accruing until August 18, 1986. Not only did plaintiff lose interest during the delay, but the coupon rate upon which the interest rate is calculated also declined during that period.
 
 
 86
 We conclude that the delay in awarding interest was improper. Section 1961 of Title 28 provides that "interest shall be calculated from the date of the entry of the judgment." 28 U.S.C. Sec. 1961. Thus, interest on the attorney's fees award should have started accruing on June 8, 1986 at the coupon rate at that time. We remand to the district court for a recalculation of the interest award accordingly.
 
 IV. CONCLUSION
 
 87
 We AFFIRM the judgment for plaintiff under Section 1983 to the extent that it imposes liability on the County for the termination of plaintiff's employment. We VACATE the damage award against the County under Section 1983 and REMAND for a new trial on the issue of damages attributed solely to the termination. We REVERSE the district court's dismissal of plaintiff's Title VII claim based upon the "personal staff" exemption and REMAND for a resolution of that claim. We AFFIRM the district court's denial of reinstatement and front pay under Section 1983. We AFFIRM the district court's award of $84,004 in attorney's fees. We VACATE the district court's award of interest on those attorney's fees and REMAND for a recalculation of that interest award in accordance with this opinion.
 
 
 
 [1]
 Although plaintiff personally complained to the Chairman of the Board of County Commissioners, she did not attempt to bring her grievance to the attention of the Board by placing it on the Board's agenda, as she could have done. (Tr. at 361-62.)
 
 
 [2]
 Plaintiff sued Creek County in the name of its Board of County Commissioners, as required by Oklahoma law. Okla.Stat.Ann. tit. 19 Sec. 4 (West 1988)
 
 
 [3]
 42 U.S.C. Sec. 1983 provides, in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [4]
 Plaintiff alleged that defendants violated the following provision of Title VII:
 It shall be an unlawful employment practice for an employer--
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....
 42 U.S.C. Sec. 2000e-2(a).
 
 
 [5]
 Plaintiff withdrew her claim for intentional infliction of emotional distress shortly before the case went to the jury. (Tr. at 1189.) The district court concluded that plaintiff's breach of contract claim "for all practical purposes, [adds] nothing" to the case and essentially dropped it from the jury instructions, without objection. (Tr. at 1131.) The district court instructed the jury, without objection, that plaintiff's wrongful termination claim hinged on the jury's conclusions about plaintiff's federal claims: "As an employee at will, plaintiff Rose Marie Starrett could be terminated at any time at the election of defendant Robert E. Wadley as long as that action did not violate plaintiff's constitutional or statutory rights." (Doc. 155.) On appeal, the parties do not contest the district court's handling of the wrongful termination claim or the breach of contract claim
 
 
 [6]
 In the remainder of this opinion, we will use the term "County" to refer collectively to the County and to Wadley in his official capacity
 
 
 [7]
 The County stipulated in the pretrial order that both Wadley and the County "acted at all times material hereto under color of state law ... within the meaning of Title 42 U.S.C. Sec. 1983." (Doc. 148A at 9.)
 
 
 [8]
 In order to complete its argument, the County requests that this Court actually go one step further. The County wants this Court to hold that Title VII constitutes plaintiff's exclusive remedy, but then to affirm the district court's holding that plaintiff cannot recover under Title VII because she was a member of Wadley's "personal staff." See Part II.A below. Thus, in the County's view, victims of sexual harassment in plaintiff's position should have no remedy at all, under either Title VII or Section 1983. We reject that contention
 
 
 [9]
 In arguing that there was not sufficient evidence to support the jury's finding, the County's brief on appeal demonstrates shocking obliviousness to the menace of sexual harassment in the workplace. The County writes:
 It is somewhat astonishing that in the most materialistic, if not hedonistic, culture ever created by man's ingenuity that rules of sexual conduct as stringent as any imagined by the Puritan fathers have suddenly been erected in the workplace. A pair of novelty glasses which picture a nude female when properly filled with water become relevant in determining whether a judgment should be rendered for sexual harassment. This in a culture whose highest court struggled with the difficulty of even defining obscenity and where billion dollar businesses (entertainment, advertising, publishing) are soundly founded upon female nudity and salaciousness. But if an improper remark is passed in the office or if the boss gets drunk and makes a pass at a secretary, whether serious or not, it's a jury question and a feast of lawyer's fees. No wonder our courts complain of being overworked.
 How much is it worth to a plaintiff if her boss flips her the finger? How much if she "thinks" he made an obscene gesture? How much for saying lets spend the afternoon at the Blue Top Motel in circumstances in which it would be almost impossible to take him seriously? How much per pinch on the rear? How much for spending an afternoon at the Cue Spot in Mannford drinking a few beers when he probably should have been working? Is this the sort of raw meat that should be thrown to a jury with no more education and instruction than to do right? And what more is an instruction that "sexual harassment is unwelcome sexual advances, requests for sexual favors and other verbal and physical conduct of a sexual nature."
 What the jury is really invited to do under such circumstances is to conduct a popularity poll. Do they approve or disapprove of the particular public official on trial. And of course, counsel are aware of this. It becomes a question of can we throw this thing on the wall and will it stick? Can we get enough of the opinions and rumors of his enemies, political opponents and dissatisfied employees through the hedge of the rules of evidence to make him look bad. If we can, we may walk away with a verdict.
 It is submitted to the Court that the facts in the case fail to show that Starrett was denied equal protection.
 (County Br. at 8-10.)
 
 
 [10]
 The district court's instruction stated: "You are instructed that expressions by the plaintiff concerning sex discrimination or sexual harassment and related retaliation and/or abuse of alcohol on the job are matters of public concern." (Doc. 155.) Although plaintiff presented evidence showing that Wadley had harassed other female employees of the department, plaintiff has not pointed us to any evidence that she spoke out about Wadley's harassment of others. Our own review of the record reveals that plaintiff's complaints focused on Wadley's harassment of her, not on Wadley's harassment of others. Nonetheless, we accept the unobjected-to jury instruction for purposes of this appeal
 
 
 [11]
 It is settled that when the First Amendment otherwise would protect an employee's statements, the fact that the employee makes the statements privately to the employer rather than publicly does not eliminate the Constitution's protections: "The private nature of the statement does not ... vitiate the status of the statement as addressing a matter of public concern." Rankin v. McPherson, 483 U.S. 378, 107 S.Ct. 2891, 2898 n. 11, 97 L.Ed.2d 315 (1987) (citing Givhan v. Western Line Consolidated School Dist., 439 U.S. 410, 414-16, 99 S.Ct. 693, 696-97, 58 L.Ed.2d 619 (1979))
 
 
 [12]
 Our conclusion that plaintiff can recover under Section 1983 for a retaliatory termination based upon First Amendment violations is not inconsistent with Tafoya v. Adams, 816 F.2d 555 (10th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). In Tafoya, we held that a Section 1983 action cannot be based solely upon a violation of the right to be free of retaliatory discharge created by Title VII. Id. at 558; see also Long v. Laramie County Community College Dist., 840 F.2d 743, 752 (10th Cir.) ("a theory of liability under federal law for retaliatory conduct ... does not give rise to a viable claim under Section 1985 [or Section 1983], and instead supports only a Title VII claim"), cert. denied, --- U.S. ----, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988). Here, as shown in Part I.A above, plaintiff's claim under Section 1983 is not based upon any substantive rights afforded by Title VII, but rather is grounded upon substantive rights granted by the First Amendment
 
 
 [13]
 The parties have not raised on appeal the possible effect of the Oklahoma Governmental Tort Claims Act, which provides that counties are liable for the acts of their officials in certain circumstances. Okla.Stat.Ann. tit. 51 Secs. 151-171 (West 1988). As a result, we do not consider the issue. See F.D.I.C. v. Liberty Nat. Bank & Trust Co., 806 F.2d 961, 963 n. 1 (10th Cir.1986); Bledsoe v. Garcia, 742 F.2d 1237, 1244 (10th Cir.1984)
 
 
 [14]
 See also, e.g., Williams v. Butler, 863 F.2d 1398 (8th Cir.1988) (en banc) (city could be liable for the actions of an elected municipal judge in harassing and firing one of his clerks because the city delegated to the judge final policymaking authority on employment matters in his court); Meade v. Grubbs, 841 F.2d 1512, 1530 (10th Cir.1988) ("Since [the sheriff] was responsible for establishing the county's policy regarding the use of force in the Oklahoma County jail, the complaint sufficiently attributed the wrongdoing to a county policy so as to withstand a motion to dismiss."); McKay v. Hammock, 730 F.2d 1367, 1375 (10th Cir.1984) ("DeLuca, as Sheriff, was the official responsible for the policies and procedures of the Routt County Sheriff's Office. Therefore, the Sheriff's Office will be liable under Monell for implementing an unconstitutional act if DeLuca knowingly was involved in an intentional constitutional deprivation.")
 
 
 [15]
 Our conclusion is further bolstered by the fact that defendants never objected to the portion of the jury instruction on municipal liability instructing the jury that Wadley was implementing County policy when he terminated plaintiff's employment. (Tr. at 1199-1200, 1248-49.) The relevant portion of the instruction provides:
 [I]f you find from a preponderance of the evidence that Mr. Wadley, as County Assessor of Creek County, Oklahoma, terminated the plaintiff in retaliation for her rejection of or her refusal to accept his alleged sexual advances, or exercising her first amendment right of freedom of expression concerning sexual harassment or alcohol, then Mr. Wadley, as the duly elected Creek County Assessor, would be implementing the policy of Creek County, Oklahoma, and the County through its Board of County Commissioners would be liable to the plaintiff therefor.
 (Doc. 155.)
 
 
 [16]
 Although, as noted above, the jury was instructed that Wadley's act of terminating plaintiff's employment was the official policy of the County, the district court did not similarly instruct the jury regarding Wadley's other acts of sexual harassment. As to those matters, the district court left it up to the jury to determine whether "Wadley's alleged acts of sexual harassment with respect to the plaintiff, Rose marie Starrett, and other female employees in the County Assessor's Office were part of a pattern of action sufficient to establish custom or policy of Creek County, Oklahoma." (Doc. 155.)
 
 
 [17]
 42 U.S.C. Sec. 2000e(f) provides, in pertinent part:
 The term "employee" means an individual employed by an employer, except that the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.
 (Emphasis added.)
 
 
 [18]
 Although not raised by the parties in this case, the "personal staff" exemption found in Title VII's definition of "employee" arguably does not apply here under a literal reading of the statute. The section of Title VII upon which plaintiff's claims are based makes it illegal to "discriminate against any individual," rather than any "employee." 42 U.S.C. Sec. 2000e-2(a)(1) (emphasis added). However, we agree with the Eighth Circuit's comment, construing an identical definition of "employee" from the Age Discrimination in Employment Act, that "it was clearly the intent of Congress that the term 'employee' ... should apply to any person who has a right to bring an action under the Act, including an applicant for employment." Stillians v. State of Iowa, 843 F.2d 276, 278 n. 2 (8th Cir.1988)
 
 
 [19]
 We express no opinion as to whether, for Title VII purposes, there is any collateral estoppel effect stemming from the now-final jury determination that Wadley's discriminatory acts violated plaintiff's rights under the First and Fourteenth Amendments
 As to plaintiff's damages, we note that plaintiff should not be allowed "double recovery" under Section 1983 and Title VII. For example, if plaintiff is awarded damages under Section 1983 for lost backpay, she cannot recover backpay damages under Title VII. Cf. Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1445 (10th Cir.1988).
 
 
 [20]
 Section 1988 provides that in actions to enforce the civil rights laws courts may, in their discretion, award the "prevailing party" a "reasonable attorney's fee."
 
 
 [21]
 Our limited reversal on the issues of damages and municipal liability does not alter our conclusion that plaintiff is sufficiently the "prevailing party" to warrant statutory attorney's fees. See generally Texas State Teachers Ass'n v. Garland Indep. School Dist., --- U.S. ----, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) ("If the plaintiff has succeeded on 'any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit' the plaintiff has crossed the threshold to a fee award of some kind.") (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278-79 (1st Cir.1978))