Wilma K. HANTON, Plaintiff,

v.

Lawrence I. GILBERT, in his personal and official capacity; Edward D. Salmon, in his personal and official capacity; Paul Hardin, in his personal capacity; and the University of North Carolina at Chapel Hill, Defendants.

Civ. No. 1:92CV00418.

United States District Court,
M.D. North Carolina,
Durham Division.

Jan. 19, 1994.

Alan McSurely, Chapel Hill, NC, for plaintiff.

Thomas J. Ziko, N.C. Dept. of Justice, Education and Correction, Raleigh, NC, Barbara A. Shaw, Asst. Atty. Gen., N.C. Dept. of Justice, Raleigh, NC, for defendants.

## MEMORANDUM OPINION

BULLOCK, Chief Judge.

Plaintiff Wilma Hanton brought this action in the General Court of Justice, Superior Court Division, Orange County, North Carolina, naming as defendants Lawrence Gilbert, Edward Salmon, Paul Hardin, and the University of North Carolina at Chapel Hill ("University") on May 26, 1992. On July 10, 1992, Defendants removed the case to this court. The matter is now before the court on Defendants' motion for summary judgment.

Plaintiff's complaint alleges three claims all arising from Plaintiff's employment and termination from employment at the University's Department of Biology. The first and third claims for relief are based on state law

and will not be addressed by the court. Plaintiff's second claim for relief is at least in part a federal constitutional claim. Pursuant to 42 U.S.C. § 1983, Plaintiff claims that Defendants Gilbert, Salmon, and Hardin, in their individual capacities, violated her federal constitutional rights under the First and Fourteenth Amendments.

For the reasons stated below, Defendants' motion for summary judgment will be granted with respect to Plaintiff's federal constitutional claim. The court, in its discretion, will remand Plaintiff's state law claims.

## FACTS

In 1984, the University's Department of Biology ("Department") purchased an electron microscope with grant monies awarded by the National Institutes of Health ("NIH"). Plaintiff, a Department employee, was assigned to the electron microscope facility, where she maintained the microscope, equipment, and supplies, taught electron microscopy and research techniques to users, and assisted faculty members with research projects. Plaintiff's immediate supervisor, Defendant Salmon, acted as chair of the Electron Microscope Committee, a faculty advisory committee which oversaw the facility's operations, and reported to Defendant Gilbert, Chairman of the Department.

After acquiring the microscope, the University paid for its annual service contract with University overhead funds. In 1989, however, when severe budget constraints rendered that source of funding unreliable, Gilbert began to explore other ways to pay for the service contract and laboratory supplies. On December 18, 1989, after consulting the Electron Microscope Committee, Gilbert announced that as of January 1, 1990, principal investigators would be charged $25.00 per hour for both use of the electron microscope and Plaintiff's performance of activities such as tissue preparation, electron microscopy, and photography. He also announced that Plaintiff would assemble a manual of procedures in the facility and be responsible for keeping detailed daily records of her own and other users' activities in the laboratory.

During the first week of January 1990, Plaintiff received a copy of Gilbert's announcement modifying her job duties and was specifically directed by Salmon to keep a daily log of activities in the facility, including the use of equipment and consumption of supplies. Plaintiff, however, told Salmon that she disagreed with the policy, saying it was wrong to charge user fees because the original grant of electron microscope purchase money provided for free microscope use. Salmon told Plaintiff that the NIH had approved the fees. Believing implementation of the policy would violate federal laws and regulations, Plaintiff contacted the North Carolina Sate Auditor's office in early January 1990. She also consulted the University Personnel Department and the Assistant to the Dean of the College of Arts and Sciences.

Plaintiff began keeping records in a logbook, but not to Gilbert and Salmon's satisfaction. Believing that the records were for billing purposes, Plaintiff tended not to record activities for which there would not be a separate charge. Furthermore, she did not update the records on a daily basis. During the spring of 1990, Defendant Salmon told Plaintiff that daily record keeping was an essential part of her job. On May 31, 1990, the Electron Microscope Committee explicitly included the clerical responsibilities in the list of Plaintiff's principal job functions, which otherwise remained essentially unchanged.

In September 1990, Defendant Salmon could not determine from Plaintiff's records how the facility had been used, how much money was to be received from users, or how Plaintiff had spent her time. In Plaintiff's annual performance review on September 7, 1990, Gilbert and Salmon reported that her performance did not meet expectations. On September 14, 1990, Salmon wrote to Gilbert recommending Plaintiff's dismissal. According to Salmon, his recommendation was based on his perception of Plaintiff's resistance to keeping accurate daily records and to developing a laboratory manual, and on her continued insistence on her right to do research without accounting for her time. On October 1, 1990, Gilbert and Salmon discussed the operation of the facility with

Plaintiff and gave her a letter reiterating her responsibility to perform her new duties. The letter reminded Plaintiff of her recent unsatisfactory performance rating and warned her that future failure to perform as required would result in termination from her position as research analyst. From October 1990 to May 1991, Plaintiff pursued an appeal of her September 7, 1990, performance review. During the appeal, Plaintiff notified the Appeals Board of her understanding that the University had committed itself to paying for the electron microscope service contract. At the Appeals Board hearing, Gilbert outlined the uncertain status of funding for microscope maintenance and Salmon noted the inadequacy of Plaintiff's records. On May 6, 1991, after careful review of the Appeals Board report, Paul Hardin, Chancellor of the University, denied Plaintiff's appeal.

During the spring of 1991, Salmon again examined Plaintiff's records but found them to be incomplete. He could not determine from them whether Plaintiff had been conducting her own research or assisting users of the facility. Again he told Plaintiff she had to keep more detailed records. On April 12, 1991, Salmon wrote to inform Gilbert of his perception that Plaintiff refused to keep the daily log.

On April 19, 1991, Plaintiff filed a complaint with the University detailing her beliefs about the University's commitment to fund the microscope service contract. On April 23, 1991, responding in writing to questions about the management of the microscope, Defendant Salmon noted that he had called the NIH and been told that the University could set its own policies in that regard. Plaintiff never approached Gilbert about her opposition to the user fee policy. Prior to her dismissal, she told neither Gilbert nor Salmon that she had complained to the University's Personnel Department, the North Carolina State Auditor's office, or the NIH, and neither Gilbert nor Salmon knew of any complaints made beyond the University.

On May 10, 1991, the Electron Microscope Committee determined that Plaintiff would not respond to direction. Based on their belief that Plaintiff refused to maintain accurate daily records of her activities despite directives to do so, the committee members unanimously recommended Plaintiff's termination for insubordination and wrote a letter to that effect to Gilbert.

On May 22, 1991, a committee established by the Dean of the College of Arts and Sciences interviewed Salmon and Gilbert about the user fees and about Plaintiff's additional allegations that Gilbert had aided and abetted theft of Plaintiff's scientific data. Gilbert believed the allegations were unfounded and was angered after the meeting.

After consulting with Collin Rustin, Jr., of the Human Resources Department, Gilbert informed Plaintiff in writing on the afternoon of May 23, 1991, that her pre-dismissal hearing would be held at 9:30 the next morning. He instructed her to vacate the premises immediately. At 9:30 on May 24, 1991, Gilbert and Rustin met with Plaintiff. During the meeting, Gilbert gave Plaintiff a copy of the May 10 letter from the Electron Microscope Committee and read it aloud to her. The letter noted Plaintiff's "insubordinate and disruptive behavior," detailed her "fail[ures] to respond to repeated requests to maintain an accurate and reliable record keeping system," and mentioned "her personal grievances [which] dominate her behavior in the EM facility." Letter of May 10, 1991, from Electron Microscope Comm. to Gilbert (Defs.' Ex. 15, filed Oct. 5, 1993). When asked to respond, Plaintiff said her attorney had advised her to remain silent. By the end of the fifteen-minute meeting, Plaintiff understood she was being dismissed.

After the meeting, Gilbert sent Plaintiff a letter confirming her dismissal for insubordination as of 9:45 a.m., May 24, 1991, and alerting her that Rustin would discuss the appeal process with her. Plaintiff received a copy of the University's employee grievance procedure after the May 24 meeting, if not sometime before.

On July 13, 1991, Plaintiff filed a grievance concerning her dismissal with the University. Her grievance was subsequently referred to Chancellor Hardin. Hardin made a final determination that Plaintiff had not filed her

grievance within the thirty days allowed under the University's grievance policy, and, therefore, she was barred from using the grievance procedure. He notified Plaintiff of his decision in a letter dated October 1, 1991.

Plaintiff then pursued other remedies, initiating both a state administrative procedure, which included a two-day hearing before a state administrative law judge in March 1992, and this civil action.

## DISCUSSION

■ Summary judgment must be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The movant bears the burden of persuasion on these issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A non-movant may survive a motion for summary judgment by producing "evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). In considering the evidence, all reasonable inferences are to be drawn in favor of the non-moving party. *Id.* at 255, 106 S.Ct. at 2513.

■ To assert a claim under 42 U.S.C. § 1983, a plaintiff must establish a deprivation of a constitutionally protected right under color of state law. In this case, Plaintiff claims violations of her First Amendment rights to freedom of speech and to petition for redress of grievance, her Fourteenth Amendment right to due process of law, and her Fourteenth Amendment right to equal protection of law.

### A. *First Amendment Retaliation*

Plaintiff argues that she exercised her First Amendment rights to free speech and to petition the government for the redress of grievances when she raised "fundamental issues about how the University handled the commitments it makes when it receives federal contracts," Pl.'s Compl. ¶ 65 (filed July 7, 1992), with her supervisor, various University offices, and the North Carolina State Auditor's office. She alleges that Gilbert and Salmon knew of her reports to these entities,

and retaliated against her or deprived her of her rights when they changed her job classification, discharged her, and otherwise treated her adversely.

■ To establish retaliation for the exercise of First Amendment rights, a public employee has the initial burden of showing both that her speech was constitutionally protected and that it was a substantial factor in her employer's decision to discharge her. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir.1992). For speech to be protected as a matter of law, first, the speech must relate to matters of public concern, and, second, the interests of the speaker and the community in the speech must outweigh the interests of the employer in maintaining an efficient workplace. *Stroman*, 981 F.2d at 156; *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1078 (4th Cir.1987), *cert. denied*, 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988) (both citing *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 [1983]; *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 [1968] ).

■ The court finds that Plaintiff's criticisms and reporting activities can "be fairly characterized as constituting speech on a matter of public concern." *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689. In raising questions about the propriety of a state university's charging fees for the use of a microscope purchased pursuant to a federal grant, Plaintiff sought "to bring to light actual or potential wrongdoing or breach of public trust." *Id.* at 148, 103 S.Ct. at 1690. While the degree of personal grievance Plaintiff expressed against her employer and her new job assignment weakens the speech's value to the community, it does not render the speech merely an expression of self-interest. *Cf. Arvinger v. Mayor of Baltimore*, 862 F.2d 75, 78 (4th Cir.1988) (expressions of both a matter of public concern and an "attack on the employer" present a paradigmatic First Amendment retaliation situation). Plaintiff's criticisms of policy made directly to Salmon or to others within the University also concerned, at least in part, matters of public

concern. *See Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (criticism expressed to supervisor in private can be of "public concern").

 Plaintiff's reports and criticisms do not, however, constitute protected speech because they fail to pass the *Connick–Pickering* balancing test. In reaching a determination of this issue, the court must balance a number of factors, including the importance of good working relationships to the efficient, successful operation of the work place; whether the speech occurred in the course of an employment dispute concerning the very application of that policy to the speaker; and whether the supervisor reasonably believed that the employee's speech threatened the supervisor's authority to run the office. *Jones v. Dodson,* 727 F.2d 1329, 1340 n. 17 (4th Cir.1984); *see also Piver,* 835 F.2d at 1081. It is not necessary for the employer to allow the office to be disrupted and working relationships to be destroyed before taking action. *Connick,* 461 U.S. at 152, 103 S.Ct. at 1692. The reasonable apprehension of damage to morale and efficiency is sufficient to outweigh First Amendment rights. *Jurgensen v. Fairfax County,* 745 F.2d 868, 879 (4th Cir.1984).

In this case, the record evidence shows damage to morale and efficiency in the Department extensive enough to outweigh Plaintiff's First Amendment rights. A good working relationship between Plaintiff, the sole electron microscope technician, and her immediate supervisors was essential to the efficient functioning of the facility. By the time Salmon wrote his letter of September 14, 1990, recommending Plaintiff's discharge, that relationship had severely deteriorated. Plaintiff expressed her criticism of the billing policy most vehemently in regard to the additional duties required by its application to her. Whatever genuine concerns she had about contract fraud were intertwined with her frustration at being asked to do clerical work that she considered "ridiculous" and "unreasonable." Hanton Dep. at 139 (Feb. 11, 1992). Given her defiance even after Salmon had told her of the NIH's confirmation that the policy was permissible, Gilbert had grounds for a reasonable belief that her activities threatened his authority to run the facility and amounted to "insubordination," as stated during the meeting of May 24, 1991. Plaintiff's resistance to the policy and her attendant failure to maintain an adequate daily log of her activities impeded the efficiency and disrupted the harmony of the facility for over a year. Defendants' interests in the facility's smooth operation outweighed Plaintiff's First Amendment interest in expressing her criticism of the billing policy and the ramifications of its application to her. Therefore, Plaintiff's speech, as a matter of law, is not constitutionally protected.

 Even if Plaintiff's speech was found to be protected, either under this analysis or as a petition to the government for the redress of a grievance, the court finds that Plaintiff cannot meet her initial burden of showing that her speech was a "motivating factor" in Defendants' adverse decisions. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Stroman,* 981 F.2d at 156. Plaintiff does not even show that it was *a* factor. First, as Defendants correctly point out, the chronology of events belies Plaintiff's claim that her office responsibilities were altered due to her speech; rather, the alteration of her responsibilities as of January 1, 1990, catalyzed her speech. Second, in light of Defendants' express denials of knowledge, Plaintiff's mere speculation as to Defendants' knowledge of her outside reporting activities is not sufficient to raise a genuine issue of fact. Third, Defendants' mere knowledge of Plaintiffs' internal criticisms and reporting is insufficient evidence of motivation.

The evidence in the record regarding the reasons for Plaintiff's firing relates to her behavior, specifically to the inadequacy of her records and her failure to comply with express directives, not to her speech. Plaintiff's mere speculation as to her employer's improper motivation does not create a genuine issue of fact in that regard. Defendants' motion for summary judgment on this claim will be granted.

### B. *Due Process Violations*

Plaintiff claims Defendants violated her Fourteenth Amendment rights to due pro-

cess. She argues that the pre-termination process she was afforded was inadequate because, without any formal warnings and with only a brief letter giving short notice of the meeting, she was read a "two-page single-spaced letter . . . [with] no specific charges in it." Pl.'s Mem.Supp.Resp. to Defs.' Mot. Summ.J. at 10 (filed June 8, 1993). She argues that the fifteen-minute meeting provided her no time to respond and that she "was not given the opportunity to review the charges in writing and respond to them" before being fired. Pl.'s Aff. ¶ 45 (filed June 8, 1993). She contends that she did not receive a "fair hearing before dispassionate parties." Pl.'s Compl. ¶ 62.

▮ Because it is undisputed that Plaintiff had a state-created property interest in her employment with the University (Defs.' Mem.Supp.Mot.Summ.J. at 19 [filed May 5, 1993] ), the court will proceed to examine what process was due and whether it was provided to Plaintiff. To determine whether a due process violation occurred, it is necessary to inquire into both the pre-deprivation safeguards and the post-deprivation remedies provided by the State. *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990).

1. Pre–Deprivation Process

▮ It is a fundamental principle of due process that prior to an intentional deprivation of a protected property interest the government must provide some notice and some form of pre-termination hearing. *See Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 569–70, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). Before discharge, a protected public employee is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). As in *Linton v. Frederick County Bd. of County Comm'rs,* 964 F.2d 1436 (4th Cir.1992), the

material facts in this case are undisputed and relate to the content of the notice given to Plaintiff, her response, and the historical context. *See id.* at 1439.

▮ Notice is sufficient "1) if it apprises the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." *Gniotek v. City of Philadelphia,* 808 F.2d 241, 244 (3d Cir. 1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987), *quoted in Linton,* 964 F.2d at 1439. The notice given Plaintiff on May 24, 1991, was both written and oral. Gilbert gave Plaintiff a copy of the May 10, 1991, letter from the Electron Microscope Committee and read it aloud to her. That letter specifically noted: (1) there had been "repeated requests to Ms. Hanton to perform her job as outlined in [Gilbert's] memo of December 18, 1989, Dr. Salmon's memo of January 5, 1990, and the Work Performance Specifications dated June 1, 1990"; (2) Plaintiff had "failed to respond to repeated requests to maintain an accurate and reliable record keeping system for the EM laboratory"; and (3) Plaintiff had "refused to keep her journal since March 1, 1991." The conclusion of the letter was that Plaintiff's behavior was "insubordinate and disruptive." Letter of May 10, 1991, from Biology Electron Microscope Comm. to Gilbert. On the advice of her attorney, Plaintiff remained silent in the face of these charges.

▮ In light of Plaintiff's response and the historical context, there can be little doubt that the explanation given Plaintiff satisfied the objective of pre-termination process to provide "an initial check against mistaken decisions." *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495. Gilbert's reading of the Microscope Committee's letter was fairly directed to Plaintiff's repeatedly inadequate compliance with specific directives to keep complete, detailed, daily records. Due process requires "only that such descriptive explanation be afforded as to permit [the plaintiff] to identify the conduct giving rise to the dismissal and thereby enable [her] to make a response." *Linton,* 964 F.2d at 1440. Furthermore, given the history of similar encounters between Plaintiff, Gilbert, and

Salmon, there is no evidence in the record to suggest that Plaintiff misunderstood any of the charges or was unable "to recognize the operative conduct." *Linton,* 964 F.2d at 1441. In fact, in saying, "[T]here was no way I could defend myself. Everything I could have said had been said earlier," Hanton Dep. at 133, Plaintiff suggests she did not respond because she felt it was futile to attempt to refute charges which had been raised before. Although generalized assertions as to her "insubordinate behavior" and "disruptive influence" accompany the letter's specific charges, "the notice is not rendered defective for due process purposes by the inclusion of unspecific and generalized catch-all allegations." *Linton,* 964 F.2d at 1441.

The pre-termination hearing need not be a full evidentiary hearing, *Loudermill,* 470 U.S. at 545, 105 S.Ct. at 1495; a fundamental requirement is that the employee have an "opportunity to present reasons, either in person or in writing, why proposed action should not be taken." *Id.* at 546, 105 S.Ct. at 1495. It is undisputed that Plaintiff was given an opportunity to respond and that she declined to do so. She would have preferred the hearing to be before a party more dispassionate than her "angry supervisor." Pl.'s Resp. to Defs.' Mot.Summ.J. at 11. However, Plaintiff concedes that due process does not require a pre-termination hearing to take place before an impartial decision-maker. Pl.'s Resp. at 11; *see Garraghty v. Jordan,* 830 F.2d 1295 (4th Cir.1987). Rather, due process requires a hearing so that the decision-maker might be fully informed before exercising its discretion to terminate or retain the employee. *See Loudermill,* 470 U.S. at 543–44, 105 S.Ct. at 1494.

The brevity of Plaintiff's time for response does not alone determine the adequacy of the process afforded. *See Linton,* 964 F.2d at 1440. Even a simple telephone call offering an employee the opportunity to discuss a discharge may satisfy pre-termination hearing requirements. *See Buschi v. Kirven,* 775 F.2d 1240 (4th Cir.1985). It is undisputed that the May 24 meeting lasted only fifteen minutes; it is also undisputed, however, that Plaintiff made no attempt to prolong the meeting by responding. Plain-

tiff's lack of response does not affect the adequacy of the pre-termination hearing afforded her. *See Dennison v. County of Frederick,* 921 F.2d 50 (4th Cir.1990) (plaintiff alleging constructive discharge resigned without responding to charges made at review meeting that complied with due process), *cert. denied,* —— U.S. ——, 111 S.Ct. 2828, 115 L.Ed.2d 998 (1991).

### 2. Post–Deprivation Process

Finding the pre-deprivation process to be adequate does not end the inquiry; the State's post-deprivation remedies must also be examined to determine whether federal due process is satisfied. Plaintiff argues that post-deprivation remedies were not made adequately available to her as she was (1) "given no written appeal rights," Pl.'s Aff. ¶ 45; (2) denied a post-deprivation hearing within the University; and (3) denied the right "to have her grievance heard quickly within the University," Pl.'s Mem.Supp.Resp. to Defs.' Mot.Summ.J. at 12, which, in sum, provided her "no post-deprivation remedy," Pl.'s Compl. ¶ 64.

This court is deciding whether the process afforded Plaintiff met federal constitutional standards, not whether it fulfilled state dismissal requirements. A violation of only state-created procedures does not constitute a federal due process violation. *Riccio v. County of Fairfax,* 907 F.2d 1459, 1469 (4th Cir.1990). The University informed Plaintiff of its employee grievance procedure, and Plaintiff had used it in the past. Defendants' failure to apprise her of those rights in a writing contemporaneous to the dismissal letter is not a violation of due process. *Cf. Crocker v. Fluvanna City Bd. of Pub. Welfare,* 859 F.2d 14 (4th Cir.1988) (where plaintiff was aware of the grievance procedure and had consulted with attorney within time frame prescribed for filing grievance, defendants' failure to apprise her affirmatively of her right to grieve did not constitute denial of due process). In July 1991, Plaintiff filed a grievance pursuant to that procedure, but, in October 1991, she was denied further consideration. There is no evidence that the wait of three months between the filing and the denial of her claim

was unreasonably prolonged. The chronology of the proceedings coupled with the assertion that she was not heard quickly does not state a claim of a constitutional deprivation. *See Loudermill,* 470 U.S. at 547, 105 S.Ct. at 1496. Nor does Hardin's refusal to give her a hearing.

■ Furthermore, even if internal University procedures were not met, the State has provided Plaintiff with fully adequate post-deprivation remedies in both administrative and judicial fora. Neither Plaintiff's decision not to respond during her pre-termination hearing nor her decision not to testify during the administrative hearings rendered the proceedings inadequate. Plaintiff has had ample opportunity to respond to charges and is still pursuing opportunities to challenge her dismissal. Due process requires that she have these opportunities, not that she ultimately prevail. Plaintiff has received and relied on an abundance of process. State officials provided Plaintiff with adequate pre-termination process, and the State provided post-deprivation administrative and tort remedies. *See Fields v. Durham,* 909 F.2d 94, 98–99 (4th Cir.1990), *cert. denied,* 498 U.S. 1068, 111 S.Ct. 786, 112 L.Ed.2d 849 (1991). Therefore, Defendants' motion for summary judgment on this claim will be granted.

## C. *Equal Protection Violations*

Plaintiff claims that Defendants violated her rights to equal protection under the law by imposing additional clerical duties and denying her a post-termination grievance hearing. She asserts that similarly situated male employees were not required to maintain daily activity logs, charge user fees, or carry out duties against their consciences, and that salaried male employees were not criticized for taking care of family responsibilities. She also alleges that male employees who were fired in the same period used the University grievance process to appeal directly to Hardin, who acted quickly on their cases, but she was denied a grievance hearing even though she gave timely notice of a grievance. Specifically, she claims that an opportunity to be heard was not granted at a "meaningful time," and alleges a denial of her right "to a Step Three Hearing with legal representation which [Hardin] had provided to at least two similarly situated males." Pl.'s Mem.Supp.Resp. to Defs.' Mot. Summ.J. at 12–13.

■ The equal protection clause confers a federal constitutional right to be free from gender discrimination that does not serve important governmental objectives and is not substantially related to those objectives. *Davis v. Passman,* 442 U.S. 228, 234– 35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979). To prevail on her claim, Plaintiff must prove intentional discrimination. *Batson v. Kentucky,* 476 U.S. 79, 93, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986). She need not show discrimination against an entire class; discrimination because of her membership in the class is enough. *Bohen v. City of East Chicago,* 799 F.2d 1180 (7th Cir.1986). Nevertheless, Plaintiff must show that she was treated differently from other similarly situated individuals and that but for her sex she would not have been so treated. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990).

■ Plaintiff, however, shows neither that there were similarly situated male employees in the Biology Department who were not asked to take on additional clerical responsibilities, nor that there were similarly situated males whose grievances were more favorably handled by Hardin. Plaintiff was the only technician in the electron microscope facility, so there were no male colleagues there to be spared from keeping records or from comments about their family responsibilities. Plaintiff does not show that the male she refers to as the greenhouse manager had either actual charge of the arboretum or teaching responsibilities, as Plaintiff did in the electron microscope facility. Plaintiff admits that the male computer technician she identifies was part of a different administrative setup and was primarily responsible for helping repair and program computers. Furthermore, Plaintiff fails to identify with any particularity the two males she alleges were dismissed in 1991 and treated more favorably than she during the grievance process. Her mere allegations unsupported by specific evidence are insufficient to

establish a genuine issue of fact regarding her equal protection claim. Defendants' motion for summary judgment on this claim will therefore be granted.

## CONCLUSION

The record as a whole in this case fails to give rise to reasonable inferences of either First Amendment retaliation or violations of Fourteenth Amendment due process or equal protection guaranties. Plaintiff speculates that she was discharged because of her reporting activities, and that she was given additional duties while at work and denied a grievance hearing after her discharge from work because of her sex. However, the facts do not establish that as a matter of law her speech was constitutionally protected. Furthermore, her evidence of causation on the one hand and comparability on the other is too tenuous to establish genuine issues of material fact under the First or Fourteenth Amendments. Finally, the undisputed facts demonstrate that Plaintiff was afforded all the process due her under the United States Constitution.

Plaintiff's remaining state law claims will be remanded for determination in state court. See *Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1965).

An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

## *ORDER and JUDGMENT*

For the reasons set forth in the memorandum opinion filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendants' motion for summary judgment is **GRANTED** as to Plaintiff's second claim for relief pursuant to 42 U.S.C. § 1983, and that claim is DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiff's first and third claims for relief based on state law are hereby **REMANDED** to the General Court of Justice, Superior Court Division, Orange County, North Carolina.