**Angela J. REDPATH, Plaintiff,**

v.

**CITY OF OVERLAND PARK, Myron Scafe, Glenn Ladd, Daniel Carney, Santos R. Castillo, Donald E. Pipes & Timothy C. Lynch, Defendants.**

**Geraldine JONES, Plaintiff,**

v.

**CITY OF OVERLAND PARK, Myron Scafe, Glenn Ladd, Daniel Carney, Santos R. Castillo, Donald E. Pipes & Timothy C. Lynch, Defendants.**

**Nos. 92–2162–KHV, 92–2163–KHV.**

United States District Court,
D. Kansas.

June 9, 1994.

Harold S. Youngentob, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for plaintiffs.

John J. Yates and Tonya Olsen Johnston, Gage & Tucker, Kansas City, MO, for defendants.

### MEMORANDUM & ORDER

VRATIL, District Judge.

This matter comes before the Court on *Defendants' Restated Motion for Summary Judgment Against Geraldine Jones* (Doc. # 52) filed December 30, 1993, in Case No. 92–2163, and *Defendants' Restated Motion for Summary Judgment Against Angela*

*Redpath* (Doc. # 50) filed December 30, 1993, in Case No. 92–2162.

## I. *Background*

Angela Redpath, a white female employee of the Police Department of Overland Park, Kansas ("the Department"), and Geraldine Jones, a black female employee of the City of Overland Park, Kansas ("the City") and former employee of the Department, allege that the Department and individuals working in the Department discriminated and retaliated against them. Defendants are the City, Chief of Police Myron Scafe, City Manager Donald Pipes, Major Timothy Lynch, Lt. Glenn Ladd, and Officers Daniel Carney and Santos Castillo. Lynch headed the Support Services division of the Department; Ladd is the Personnel/Training Director of Support Services. Officers Carney and Castillo worked with plaintiffs in the Drug Abuse Resistance Education ("D.A.R.E.") program. Scafe, Pipes, Lynch, Ladd, and Carney are white males. Castillo is a Hispanic male.

The Department[1] hired Jones in 1986 and Redpath in 1988, initially placing them in the Patrol division. In 1990, in response to an interdepartmental memorandum, plaintiffs applied for newly available positions as Crime Prevention/D.A.R.E. officers in the Support Services division. After conducting written and oral interviews, the Department selected plaintiffs and, on May 20, 1990, transferred them to their new positions in Support Services. Although the transfers involved no change in salary, rank, or benefits for either plaintiff, both contend that officers within the Department viewed the D.A.R.E. position as "a promotion and a favorable career step" and that the assignments were permanent.

Conflict arose in the D.A.R.E. program almost immediately. On June 4, 1990, Jones complained to her immediate supervisor, Lt. Phil Barbour,[2] that Castillo disliked her and refused to work with her on a background investigation. On June 5, 1990, Barbour held a meeting of all D.A.R.E. officers where he reminded everyone that D.A.R.E. was a "team effort" and that anyone who was a source of conflict would be removed. Barbour sent a written report of these events to his supervisor, Lynch, who on at least one occasion thereafter asked Jones if she was having any problems with the D.A.R.E. officers. Jones replied that she was not.

On January 28, 1991, Ladd met with Jones to discuss several complaints[3], directed her to attend a consultation with the Employee Assistance Program ("EAP"), and enrolled her in a communications class. Sometime later, Ladd held an informal meeting at his home to discuss the apparent personality conflicts that appeared to continue in the D.A.R.E. Unit. Ladd again expressed his expectation that the officers would work out their differences and cooperate. On March 28, 1991, however, in response to yet another complaint[4], the Department re-assigned

---

1. The Department is divided into three separate divisions; Operations (Patrol), Investigations, and Support Services. Officers are assigned to particular divisions based on departmental needs, and no assignments are permanent.

2. Lt. Ladd replaced Lt. Barbour as D.A.R.E. supervisor in December, 1990 or January, 1991.

3. On November 15, 1990, two teachers at an elementary school where Jones was presenting the D.A.R.E. program complained to Ladd that Jones failed to stimulate the children, applied overly harsh discipline, and exhibited poor grammar skills. On January 11, 1991, Carney wrote a memorandum to Ladd stating that a sixth grade teacher at Apache Elementary School told him that she and another sixth grade teacher at Apache felt that the D.A.R.E. program as presented by Jones had been a complete waste of time that semester because Jones was "mean spirited," "did not understand children," "did not communicate well," "utilized poor English

skills," and "should not be teaching in any elementary school." Carney's memorandum also mentioned an unspecified incident with an official from the Shawnee Mission School District.

4. On March 28, 1991, Ladd received a telephone call from Dr. James Owens, the principal of John Deemer School, during which Owens related complaints about Jones from various teachers at the school that Jones was overly harsh in her discipline, used incorrect grammar, and failed to show up for one scheduled presentation. One teacher told Owens that she did not want Jones to return for the fourth session. Because of the similarity to the earlier complaints, Ladd called the principals at the various schools in which Jones was making D.A.R.E. presentations. The only response he received was from Dr. Margaret McNieve, principal at the Oak Park Elementary school, who said that her sixth grade teachers had complained that Jones's harsh discipline of the children created an "unpleasant feeling tone

Jones from the D.A.R.E. Unite to the associated Crime Prevention unit for which she had been cross-trained. Six weeks later, on May 10, 1991, the Department temporarily assigned Jones to the Investigative Division to assist with a labor-intensive wiretap investigation.

The problems in the D.A.R.E. Unit, however, appear to have extended beyond Castillo and Jones. On June 18, 1991, Redpath filed a written complaint informing Ladd that (1) Carney criticized the way the children under Redpath's supervision had performed certain skits at the Stanley Elementary graduation ceremony; (2) Castillo said that he and Carney were going to start calling Redpath and her husband (whose nickname was "Spud") "Spud and Spudless" because they had no children; and (3) Castillo and Carney laughingly said that Redpath and her husband had no children because they weren't "right with God." On June 24, 1991, Redpath filed a second written complaint—this time with Lynch—detailing other incidents in which she alleged that Carney was critical of her or her work. Redpath also complained that Castillo and Carney accused her of "taking sides" with Jones and that a generally tense atmosphere pervaded the D.A.R.E. program because of hostility and personality conflicts between Castillo and Jones and, to a lesser extent, Carney and Jones.

Ladd interviewed Carney and Castillo and required them to respond to the allegations in writing. Carney denied or attempted to explain Redpath's allegations and lodged his own complaints against Redpath, alleging that she often referred to him and Castillo as "fags" and that she had told a vulgar joke about one of the Seven Dwarfs having sex with a penguin that he had mistaken for a Catholic nun. Carney alleged that Redpath's conduct evidenced an insensitivity to the very conduct code which she claimed Carney had violated. In his written responses, Castillo admitted making the "Spudless" and "not right with God" comments but insisted that he did not intend to insult Redpath. Castillo further stated that Redpath had called him

and Carney "fags" and had often threatened to "burn them."

On June 25, 1991, Redpath filed a third written complaint, accusing Castillo and Carney of asking whether she had "PMS" and why she was "so bitchy," accusing Carney of telling a racial joke, and accusing Carney of saying, "There's a difference between black people and niggers, and [Jones] is a nigger." Redpath also claimed that Castillo told her he hoped that Jones had complications with her pregnancy and that Carney asked her whether she and her husband had lived together before they married and told her he thought that it was ethically wrong for both parents to work.

In a response filed July 1, 1991, Redpath denied the bulk of Carney and Castillo's allegations but admitted telling the Seven Dwarfs joke and calling Carney and Castillo "fags," although she denied that her statement had any sexual connotations. On July 2, 1991, Carney denied all of Redpath's new allegations.

Although Jones was no longer a member of the D.A.R.E. Unit, the complaints and allegations between Carney, Castillo, and Redpath drew her back into the fray. On July 1, 1991, Jones became an active participant in Ladd's investigation, filing a memorandum alleging that Castillo (1) refused to extend to her normal office courtesies; (2) accused her of playing a "skin game"; (3) called a black workshop speaker racist; (4) removed his radio from the office so that Jones could not play her "nigger music"; and (5) was generally rude and sarcastic to her and suggested that she would not be in D.A.R.E. much longer. Jones also alleged that Carney suggested that she move out of the D.A.R.E. office to alleviate the tension between her and Castillo.

In response to these allegations, Castillo conceded his personal dislike for Jones, admitting that he stated in a letter to Carney that "the only hatchet I'd like to bury with [Jones] is one between her eyes." Castillo, however, explained that his dislike for Jones was not because of her race or gender but

in the classroom." Jones counters, and the Court acknowledges, that she received favorable

reviews from other school officials in the past.

because she was hostile to him. Castillo alleged that Jones never spoke to him, would obtain information from him only through other people, and acted insulted anytime he offered advice or instructions to her. Castillo admitted that he called the workshop speaker racist, but attributed that comment to the speaker's views, not to any racial animus. Finally, Castillo denied threatening Jones' career or stating that she would not be with D.A.R.E. much longer.

On July 3, 1991, after interviewing all parties and witnesses and reading the written complaints and responses, Ladd drafted a twenty-four page report summarizing all of the allegations and responses. Based on the conduct admitted by the parties,[5] Ladd concluded that (1) Castillo violated General Order 85–02 when he made references to Redpath's inability to have children; (2) Redpath violated General Order 85–02 when she told the Seven Dwarfs joke and repeatedly referred to Carney and Castillo as "fags"; but that (3) neither Carney not Jones violated the conduct code.

After reviewing Ladd's report, Lynch issued Letters of Reprimand to Carney, Castillo, and Redpath on July 10, 1991. Lynch determined that Carney and Castillo violated General Order 85–02 and Administrative Policy # 46 when they mocked the way Jones pronounced certain words. Lynch determined that Redpath violated General Order 85–02 and Administrative Policy # 46 when she referred to Carney and Castillo as fags and when she told the Seven Dwarfs joke. Jones was not reprimanded for any conduct related to the investigation. However, Jones was issued a letter of reprimand and docked six and one-half hours of pay on July 8, 1991, for violating the Department's leave policy.

Jones and Redpath contacted the Kansas Human Rights Commission ("KHRC") on July 2, 1991, and filed discrimination charges on July 23, 1991. The KHRC transmitted those charges to the EEOC. On August 11, 1991, Lynch determined that personality conflicts between Carney, Castillo, and Redpath prevented them from advancing the objectives of the D.A.R.E. program and transferred all three of them to Patrol, a much larger division. On that date, Lynch also transferred Jones from Support Services to Patrol, effective upon her return from maternity leave.[6]

The final episode in this saga occurred in 1992 in the Patrol division. Jones' supervisor in Patrol, Major John Douglass, learned during a staff meeting that Jones believed that her problems with Carney were resurfacing. Another internal investigation took place and was closed with no action taken. In March 1992, pursuant to her request, the City transferred Jones from Patrol to its Community Services Department.

Plaintiffs filed suit on May 5, 1992. Redpath contends that her treatment in the Department, the Letter of Reprimand, and her transfer to Patrol were the result of (1) sexual discrimination and harassment; (2) retaliation; and (3) a conspiracy to deprive her of her civil rights. Redpath thus seeks relief under 42 U.S.C. §§ 1983, 1985, 1988, and 2000e et seq. (Title VII); the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991); and the First and Fourteenth Amendments. Jones contends that her treatment in the Department, her temporary assignment to Investigations, her Letter of Reprimand, her transfer to Patrol, and her alleged constructive discharge were the result of (1) racial and sexual discrimination and harassment; (2) retaliation; and (3) a conspiracy to deprive her of her civil rights. Jones thus seeks relief under 42 U.S.C. §§ 1981, 1983, 1985, 1988, and 2000e et seq. (Title VII); the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991); and the First and Fourteenth Amendments. Both plaintiffs request reinstatement to the D.A.R.E. program, actual damages, compensatory damages, punitive damages, back pay, differential back pay, lost benefits, costs, attorneys fees, and interest.

On September 21, 1992, defendants Scafe, Lynch, Ladd, and Pipes moved for summary judgment against both plaintiffs under the

---

5. Ladd based his finding solely on the admitted conduct because he felt that he could not corroborate the remainder of the cross-allegations.

6. Jones took maternity leave beginning August 5, 1991.

doctrine of qualified immunity. In addition, all defendants moved for summary judgment on the ground that plaintiffs had failed to allege facts sufficient to support their legal claims. These motions were pending for over a year, during which time the Court attempted—with little success—to discern which claims and defenses were asserted against which parties. On November 30, 1993, the Court directed plaintiffs to restate their claims, stating which claims were asserted against which parties and which acts were the basis those claims.[7] The Court then directed defendants to restate their motions for summary judgment and dismissed the original motions for summary judgment without prejudice. Plaintiffs clarified their pleadings, and defendants timely reasserted their motions for summary judgment, to which the Court now turns.[8]

## II. *Standard of Review*

Summary judgment must be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The Court considers all evidence and reasonable inferences therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The non-moving party, however, "may not rest upon its pleadings but must set forth specific facts showing that there is a genuine issue for trial

as to those matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *see Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

As to those claims for which the defense of qualified immunity properly has been raised, the Court proceeds somewhat differently. "The defense of qualified immunity is designed not only to shield police officers from liability, but also to ensure that erroneous suits do not even go to trial." *Hinton v. City of Elwood,* 997 F.2d 774, 779 (10th Cir.1993). To sustain a suit against a claim of qualified immunity, plaintiff must "show that the law was clearly established when the alleged violation occurred and come forward with facts or allegations sufficient to show that the official violated the clearly established law." [9] *Woodward v. City of Worland,* 977 F.2d 1392, 1396 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 3038, 125 L.Ed.2d 724 (1993). Only if plaintiff can make that twofold showing does the Court return to the ordinary summary judgment standards to determine whether any material issues of fact remain as to whether the official's actions were objectively reasonable in light of the law and the information existing at the time. *See Hinton,* 997 F.2d at 779. In this regard, "[a]n official is protected from personal liability if his allegedly unlawful official action was objectively reasonable when assessed in light of legal rules that were clearly established when the action was taken." *Chapman v. Nichols,* 989 F.2d 393, 397 (10th Cir.1993).

---

7. Plaintiffs complain in their responses to defendants' restated motions for summary judgment that the Court has imposed an impermissibly heightened pleading requirement. *See Leatherman v. Tarrant Co. Narcotics Intelligence & Coordination Unit,* —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). The Court did direct plaintiffs to restate their claims and to link their evidence to their allegations, but it did so not in the context of a motion to dismiss but in the face of motions for summary judgment. The Court did not dismiss the complaints or otherwise adjudicate their merits, but only asked plaintiffs to tell us who they were suing under which claims. This procedure, if unusual, was required by plaintiffs' haphazard pleadings and ultimately demanded only that plaintiffs satisfy the applicable summary judgment standards.

8. On May 27, 1994, the Court granted Redpath leave to amend her complaint to state a Title VII pregnancy discrimination claim, a claim under the Kansas Act Against Discrimination, and various state common law claims. None of those claims are presently before the Court.

9. As is discussed more fully herein, the Court employs a burden shifting analysis to determine whether the plaintiff can establish a violation of the law where the government official's subjective intent is an element of the violation. *See Lewis v. City of Fort Collins,* 903 F.2d 752, 758 (10th Cir.1990).

**1456**

### III. *Title VII*

Plaintiffs claim that the City and all individual defendants are liable under Title VII of the Civil Rights Act of 1964. In response to the Court's instructions in its *Order* (Doc. # 46) entered November 30, 1993, plaintiffs make clear that the individual defendants are sued only in their official capacities. Defendants seek summary judgment on the ground that (1) the individual defendants have no personal liability; and (2) summary judgment is appropriate because plaintiffs cannot establish intent to discriminate.

The Tenth Circuit has squarely held, and plaintiffs squarely acknowledge, that individual capacity suits are inappropriate under Title VII. *See Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993). Individuals may be sued under Title VII only in their official capacities. *See id.; Barger v. Kansas*, 630 F.Supp. 88, 90 (D.Kan.1985). An official capacity suit does not provide an avenue of relief against the individual, however, but operates as an alternative means of naming the individual's employer.[10] *See Sauers*, 1 F.3d at 1125 ("We think the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly."); *see also Starrett v. Wadley*, 876 F.2d 808, 813 (10th Cir.1989) (municipality and supervisory official sued in official capacity are "essentially the same entity"). Any relief afforded to plaintiffs through an "official capacity" suit will be at the expense of the employer, not the individual. *See Stafford v. Missouri*, 835 F.Supp. 1136, 1149 (W.D.Mo.1993).

This legal framework spawns several corollaries relevant to the pleadings in this case. First, it is inappropriate to name nonsupervisory employees individually: they obviously have no personal liability, and they are not "agent-employees" such that an official capacity suit serves as the equivalent of suing the employer. *See Sauers*, 1 F.3d at 1125. Second, where the employer has been sued directly, it is duplicative to sue the supervisory employees in their official capacities. The employer is liable without knowledge for the acts of its agent-employees regardless of whether that theory manifests itself in the caption, and the plaintiff can obtain no additional relief by pleading in this manner. Accordingly, the Court enters judgment as a matter of law on all of plaintiffs' Title VII claims against the individual defendants.

Defendants contend that summary judgment also is appropriate on plaintiffs' Title VII claims against the City because the record does not support a finding of intentional discrimination. The parties have not completed discovery, and plaintiffs maintain that discovery will supply the requisite evidence of intent. The City, which may not avail itself of the defense of qualified immunity, has not demonstrated that a ruling on the issue of intent is warranted at this time.[11]

---

10. This Court would so rule even absent controlling Tenth Circuit precedent. The Court agrees with those decisions which infer from Title VII's statutory scheme that Congress did not intend to impose individual liability on employees, *see Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 372 (1994); *Smith v. Capitol City Club*, 850 F.Supp. 976 (M.D.Ala.1994), and further agrees that the prospect of employer liability is sufficient to effectively deter individual misconduct. *See Johnson v. No. Ind. Pub. Serv. Co.*, 844 F.Supp. 466, 469 (N.D.Ind.1994). The Court acknowledges that this limitation regrettably may leave some victims of employment discrimination without any meaningful remedy, but it cannot impose liability where Congress has chosen not to do so. *See Lowry v. Clark*, 843 F.Supp. 228, 231 (E.D.Ky.1994).

11. The Tenth Circuit's decision in *Lewis v. City of Fort Collins*, 903 F.2d 752 (10th Cir.1990), does not compel a different result. The plaintiff in that case asserted claims against her employer (the City of Fort Collins) and various city officials under the ADEA, Title VII, and 42 U.S.C. §§ 1981 and 1983. *Id.* at 753. The individual defendants sought summary judgment before the commencement of discovery, asserting qualified immunity. *Id.* at 754. The district court denied the motion; the Tenth Circuit reversed. Finding (1) that intentional discrimination was an essential element of all of the plaintiff's claims and (2) that record did not contain evidence of discriminatory intent, the court held that the appellants were entitled to qualified immunity on all of plaintiff's constitutional *and statutory* claims. *Id.* at 760.

The instant case is different for two important reasons. First, *Lewis* establishes no precedent

■ Finally, the Court notes that, while plaintiff has pleaded claims under the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (1991), that Act is not itself a vehicle for the redress of rights but rather a series of amendments to existing statutes. The relevance of the Act in this case, then, is whether any of those amendments apply to the conduct at issue in this case. With respect to Title VII, the Supreme Court recently clarified that § 102 of the Act[12] does not apply to cases arising prior to its enactment. *Landgraf v. USI Film Prods.,* — U.S. —, —, 114 S.Ct. 1483, 1508, 128 L.Ed.2d 229 (1994). Although further inquiry into these matters is premature given the Court's decision to defer ruling on the merits of plaintiffs' Title VII claims, the Court notes that Redpath complains of no conduct occurring after August 11, 1991. Jones, however, alleges that the discrimination against her continued until her alleged constructive discharge in March, 1991. Needless to say, any further argument regarding plaintiffs claims under Title VII must reflect a reasoned consideration of *Landgraf*'s statements on retroactivity.

## IV. *Section 1983*

Plaintiffs contend that defendants violated their rights under the First and Fourteenth Amendments.[13] All defendants deny violating any of plaintiffs' rights. In addition, individual defendants Scafe, Pipes, Lynch, and Ladd assert the defense of qualified immunity.[14]

■ Section 1983 does not itself create any substantive rights. *Gallegos v. City & County of Denver,* 984 F.2d 358, 362 (10th Cir.1993), *cert. denied,* — U.S. —, .113 S.Ct. 2962, 125 L.Ed.2d 662 (1993). It merely grants an avenue of relief to a plaintiff who has been deprived of an existing constitutional or federal statutory right by a person acting under color of state law. *Id.* Because § 1983 reaches only deliberate deprivations of federally protected rights, *see Woodward,* 977 F.2d at 1399, there is no liability under a theory of respondeat superior. A supervisor violates § 1983, however, when he directs his subordinates to engage in unlawful conduct or when he acquiesces in the unlawful conduct of his subordinates of which he knew or should have known. *Id.; see Langley v. Adams County,* 987 F.2d 1473, 1481 (10th Cir.1993). The Court therefore must determine whether defendants deliberately deprived plaintiffs of any right secured by the First or Fourteenth Amendments.

"A public employer may not condition employment or its incidents upon an employee's relinquishment of his or her First Amend-

for granting qualified immunity to a municipality: the municipality was not even a party to the appeal. Second, *Lewis* was decided prior to the Tenth Circuit's decision in *Sauers,* in which the court made it clear that individuals have no Title VII liability. It appears that the district court in *Lewis* permitted the individual defendants to be sued as individuals under Title VII but then cloaked them with qualified immunity. *See, e.g., Busby v. City of Orlando,* 931 F.2d 764, 772 (11th Cir.1991) (if state officers could be sued individually under Title VII, they would receive qualified immunity). This line of analysis now stands repudiated by *Sauers.* Accordingly, the Court cannot construe *Lewis* to stand for the proposition that, where the pre-discovery record yields no specific evidence of intent, a grant of qualified immunity to individual defendants also requires summary judgment for a municipality on claims brought under Title VII.

**12.** Section 102 authorizes compensatory and punitive damages in certain cases of unlawful intentional discrimination and provides for trial by jury where such damages are sought.

**13.** Plaintiffs also allege § 1983 violations arising out of their right to be free from racial and sexual discrimination and harassment and their right to be free from discrimination and harassment for reporting racial discrimination and harassment, but do not specify the source of those rights. To the extent plaintiffs are referring to possible Title VII violations, it is settled in the Tenth Circuit that Title VII violations will not support claims under § 1983. *See Starrett,* 876 F.2d at 813. If plaintiffs refer to the violation of a federal right protected by something other than the First and Fourteenth Amendments or Title VII, their pleadings do not indicate what that might be.

**14.** It is clear from the pleadings that the individual defendants are sued under § 1983 in their individual capacities. *See, e.g., Pride v. Does,* 997 F.2d 712, 715 (10th Cir.1993). To the extent that they are sued in their official capacities, those claims merely duplicate the claims brought directly against the City. *See Russ v. Uppah,* 972 F.2d 300, 303 (10th Cir.1992).

ment Rights." *Woodward*, 977 F.2d at 1403. Assuming that plaintiffs' speech was constitutionally protected,[15] the Court employs the *Mount Healthy* test to determine whether the speech was a motivating factor in the adverse employment decisions or whether the employer would have made the same decisions absent the speech. *See Wulf v. City of Wichita*, 883 F.2d 842, 856–57 (10th Cir.1989); *Johnsen v. Ind. Sch. Dist. No. 3*, 891 F.2d 1485, 1490 (10th Cir.1989).

The Equal Protection Clause of the Fourteenth Amendment confers the right to be free from unlawful gender and race discrimination. *See Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979) (gender); *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S.Ct. 1712, 1716–17, 90 L.Ed.2d 69 (1986). The ultimate issue in any case alleging a violation of the Equal Protection Clause is whether plaintiffs can prove intentional discrimination. *See Batson*, 476 U.S. at 93, 106 S.Ct. at 1721. Plaintiffs must show that they were treated differently because of their membership in a protected class, and not for some other reason. *See Bohen v. City of East Chicago*, 799 F.2d 1180, 1187 (7th Cir.1986); *see also Hanton v. Gilbert*, 842 F.Supp. 845, 854 (M.D.N.C. 1994); *Stafford*, 835 F.Supp. at 1141.

### 1. *Letters of Reprimand*

Jones received a letter of reprimand on July 9, 1991, stating that she had violated Department policy by taking unauthorized vacation leave. Redpath received a letter of reprimand on July 10, 1991, stating that she had violated Department policy by referring to Carney and Castillo as "fags" and telling the Seven Dwarfs joke. Carney and Castillo also received letters of reprimand on July 10, 1991, for related policy violations. Plaintiffs allege that defendants violated their rights under the First and Fourteenth Amendments in that their respective letters of reprimand were racially and sexually discriminatory and were issued to retaliate against

them for complaining about acts of racial and sexual discrimination within the D.A.R.E. unit. Defendants deny these claims, and Scafe, Pipes, Lynch, and Ladd assert the defense of qualified immunity.

#### a. *Carney and Castillo*

Carney and Castillo were plaintiffs' co-workers. Plaintiffs present no evidence that Carney or Castillo issued the letters of reprimand about which they complain. Rather, the letters clearly reflect that they were issued by Scafe, under Lynch's signature. Carney and Castillo therefore are entitled to summary judgment on these claims. *See Langley*, 987 F.2d at 1479.

#### b. *Scafe, Pipes, Lynch, and Ladd*

Defendants contend that they are entitled to qualified immunity because plaintiffs have failed to establish the element of intent. Improper motive is a required element of a claim under both the First Amendment, *see Hicks v. City of Watonga*, 942 F.2d 737, 749 (10th Cir.1991), and the Fourteenth Amendment, *see Lewis v. City of Fort Collins*, 903 F.2d 752, 755 n. 1 (10th Cir.1990).

As noted previously, government officials are immune from suit for any conduct which was objectively reasonable under the circumstances. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). That objective test is in tension with, but not inconsistent with, a claim of qualified immunity where the existence of a violation of the clearly established law depends on the government official's subjective intent. For that reason, the Tenth Circuit has created a two-step analysis to be applied in situations such as this. "Where a defendant's subjective intent is an element of plaintiff's claim and the defendant moves for summary judgment based on qualified immunity, the defendant must make a prima facie showing of the "objective reasonableness" of the challenged conduct." *Lewis*, 903 F.2d at 755. If the defendant can establish the ob-

---

15. Ordinarily, the Court would engage in a two-part analysis (1) to determine whether the employees' speech constituted a matter of public concern; and (2) to balance the interests of employee comment against the interests of State as the provider of efficient public services. *See*

*Langley*, 987 F.2d at 1479; *Woodward*, 977 F.2d at 1403. Because defendants do not argue these threshold requirements, the Court assumes for purposes of resolving these motions that plaintiffs engaged in protected speech.

jective reasonableness of his or her actions, the plaintiff may avoid summary judgment only by pointing to specific evidence that the official's actions were improperly motivated. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir.1988); *Lewis*, 903 F.2d at 759.

 The Court finds that the issuance of both letters of reprimand was objectively reasonable. First, the letters of reprimand both stemmed from violations of Department policy. Redpath admits that she told the Seven Dwarfs joke and referred to Carney and Castillo as "fags." Similarly, Jones admits that she attempted to take sick leave in order to pursue family business and, when told she could not do that, took unapproved vacation leave. Clearly, letters of reprimand were objectively reasonable responses to these admitted actions.

Because defendants have satisfied their prima facie burden, plaintiffs can avoid summary judgment only by identifying specific evidence of discriminatory motive. *See, e.g., Patrick v. Miller*, 953 F.2d 1240, 1242 (10th Cir.1992) (plaintiff's speech disturbed defendant enough to elicit comment that plaintiff should be fired); *Hicks*, 942 F.2d at 741 (defendant Councilwoman stated that she wanted plaintiff's "head on a platter"); *Wulf*, 883 F.2d at 862 ("If that's the case, I'll have his ass."); *Starrett*, 876 F.2d at 812 (after terminating plaintiff, defendant told her that "I don't like you going to an attorney."). Where the plaintiff can offer only conclusory allegations of intent to retaliate, however, summary judgment has been appropriate. *See Gallegos*, 984 F.2d at 363–64; *Hicks*, 942 F.2d at 749 (no evidence that defendant police chief was improperly motivated); *Lewis*, 903 F.2d at 759.

 In this case, plaintiffs can present no specific evidence that the letters of reprimand were improperly motivated. Primarily, plaintiffs offer an undated, unsigned, and unsworn four page typewritten document (the "Round Memo") allegedly authored by John Round, a former Major of the Overland Park Police Department. The so-called Round Memo, however, does not satisfy the requirements of Fed.R.Civ.P. 56(e), and the Court therefore may not consider it for purposes of this motion.[16] *See Jackson v. Griffith*, 480 F.2d 261, 268 (10th Cir.1973).

Plaintiffs also offer the declaration of their former supervisor, Phillip Barbour. In his declaration, Barbour states the plaintiffs scored well in their initial interviews, performed well in the D.A.R.E. program, and that as of late November 1991 there was no reason to remove either of them from the D.A.R.E. program. Barbour also relates that his hopes for advancement within the Overland Park Police Department ended after his involvement in the Cindy Scott case. Plainly, Barbour's declaration contains no specific evidence that the letters of reprimand, issued over eight months after he left D.A.R.E., were improperly motivated. *See, e.g., Lewis*, 903 F.2d at 758 (prior performance evaluations not relevant to intent).

 Plaintiffs fall-back position is that the Court should defer ruling on summary judgment pending additional discovery pursuant to Fed.R.Civ.P. 56(f).[17] Under other circumstances, the Court might be inclined to permit Rule 56(f) discovery freely and liberally. *See, e.g., Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260, 1264 (10th Cir.1984). Because qualified immunity's protection extends to discovery, however, a plaintiff seeking to fend off summary judgment when qualified immunity has been raised must demonstrate precisely *how* the additional discovery will rebut the defendant's showing of objective reasonableness. *Lewis*, 903 F.2d at 758. Plaintiffs' attorney has submitted his affidavit stating that the proposed discovery would (1) follow up on the discrimination alleged in the Round

---

16. Plaintiffs cannot convert the document into admissible evidence simply by having their attorney submit an affidavit attesting to its origin.

17. Rule 56(f) states:
"Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

Memo; (2) obtain the City's files relating to the plaintiff in a prior discrimination case, Cindy Scott; and (3) examine personnel files to demonstrate that women and racial minorities are treated differently than white males. The Court is not persuaded that it is appropriate to defer summary judgment.

First, plaintiffs request for discovery of City files and of the City's personnel practices are not grounded upon the existence of any *specific* evidence which discovery would document and confirm, but arise from plaintiffs' belief that discovery of these matters will yield the evidence that they seek. This is exactly the kind of fishing expedition—based on conclusory allegations—that the Tenth Circuit has condemned time and time again. *See Committee for the First Amendment v. Campbell,* 962 F.2d 1517, 1523 n. 7 (10th Cir.1992); *Hicks,* 942 F.2d at 749 n. 5; *Lewis,* 903 F.2d at 759.

Second, the Court is not persuaded that anything in the Round Memo constitutes the type of specific evidence with which plaintiffs could establish that the letters of reprimand were discriminatorily motivated. While the Round Memo purports to catalog instances in which Scafe displayed racial and sexual bigotry by offensive racial and sexual remarks, it does not identify any specific evidence of improper motive. In addition, nothing in the Barbour declaration is germane to this matter. The Court therefore concludes that plaintiffs have failed to rebut defendants' prima facie showing that it was objectively reasonable to issue the letters of reprimand to plaintiffs. Accordingly, defendants Scafe, Pipes, Lynch, and Ladd are entitled to qualified immunity on those claims.

c. *The City*

 Plaintiffs allege that the City is liable for the alleged violations of their rights under the First and Fourteenth Amendment. An underlying constitutional violation is a necessary but not sufficient condition for municipal violation. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (necessary); *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978) (but not sufficient). "Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Hinton,* 997 F.2d at 782. Where the municipality has delegated final policymaking authority to an individual, the acts of the individual are deemed those of the municipality. *See Starrett,* 876 F.2d at 818.

 In this case, plaintiffs cannot establish that the letters of reprimand constituted an underlying violation. Carney and Castillo did not violate the constitution because they did not issue the letters of reprimand. Scafe, Pipes, Lynch, and Ladd did not violate the constitution because their conduct was objectively reasonable. When qualified immunity is granted because plaintiffs cannot establish a constitutional violation—rather than on a determination that the law was not clearly established—such a finding is equivalent to a decision on the merits and precludes municipal liability. *See Hinton,* 997 F.2d at 783. The Court therefore grants summary judgment for the City on plaintiffs' § 1983 claims based the letters of reprimand.

2. *Transfers from D.A.R.E.*

Plaintiffs contend that their transfers out of D.A.R.E. were racially and sexually discriminatory and were effected with the intent to retaliate against them for complaining about acts of racial and sexual discrimination within the D.A.R.E. program. Defendants deny the violations, and Scafe, Pipes, Lynch, and Ladd assert the defense of qualified immunity.

a. *Carney and Castillo*

Carney and Castillo were plaintiffs' coworkers. Because the record is devoid of any evidence that they transferred plaintiffs out of D.A.R.E., the Court grants summary judgment for them on these claims. *See Langley,* 987 F.2d at 1479.

b. *Scafe, Pipes, Lynch, and Ladd*

Defendants Lynch and Ladd raise the defense of qualified immunity and contend that plaintiffs' transfers out of D.A.R.E. were objectively reasonable because they were founded on legitimate concerns about the

plaintiffs' ability to participate effectively in the D.A.R.E. program. The Court agrees.

■ The record firmly establishes that the City had received complaints from several school officials that Jones demonstrated poor presentation, communication, and language skills. Given the "public relations" nature of the D.A.R.E. program, where communication and language skills are of heightened importance, it was objectively reasonable to transfer an officer who elicited complaints in that regard.

The Court also finds that it was objectively reasonable to transfer Redpath from the D.A.R.E. program. The record sadly details the decayed working atmosphere within the D.A.R.E. program. Redpath admitted to engaging in some of the conduct which contributed to that situation. In light of Ladd's written report detailing the conduct code violations by Redpath and Castillo, Lynch decided to transfer all of them out of the closely knit D.A.R.E. program and into the larger Patrol division. Police departments are held to have a particularly heightened interest in maintaining discipline, especially where disruption of operations has resulted. *Wulf,* 883 F.2d at 865–67. The Court is satisfied that defendants have made a prima facie showing of objective reasonableness based on the personal conflicts which had arisen. *See, e.g., Lewis,* 903 F.2d at 757–58 (discussing weak communications and interpersonal skills).

Defendants having established the objective reasonableness of the transfers, it is plaintiffs' burden to rebut that showing with specific evidence of improper motive. Again, plaintiffs both fail to meet this burden and fail to identify any particular item of discovery that would produce the lacking evidence. The Court therefore concludes that defendants Scafe, Pipes, Lynch, and Ladd are entitled to qualified immunity on these claims.

*c. The City*

Plaintiffs once again have failed to establish an underlying constitutional violation. The Court therefore enters summary judgment for the City.

### 3. Racial and Sexual Harassment

Plaintiffs allege that defendants created and perpetuated a racially and sexually hostile work environment within the D.A.R.E. program. All defendants deny much of the alleged conduct and contend that even under plaintiffs' version of the facts, no hostile work environment existed. Defendants Scafe, Pipes, Lynch, and Ladd also assert the defense of qualified immunity.

■ It has been clear since May of 1989 that sexual harassment under color of state law violates the Equal Protection Clause. *See Woodward,* 977 F.2d at 1397; *Starrett,* 876 F.2d at 814. The Tenth Circuit recently relied on *Starrett* in stating that racial harassment under color of state law also violates the Equal Protection Clause. *See Ryan v. City of Shawnee,* 13 F.3d 345, 349– 50 (10th Cir.1993). Given the rationale of *Starrett,* the Court believes that racial harassment was clearly established as unconstitutional in 1989, with *Ryan* simply being the Tenth Circuit's first opportunity to set forth that manifestly evident proposition. What is not at all clear, however, is what constitutes a hostile work environment in the context of § 1983.[18] *See Stepp v. Proctor,* 13 F.3d 407, 1993 WL 498172, at *1 (10th Cir. Dec. 2, 1993) (unpublished opinion) (see General Order of November 29, 1993, suspending 10th Cir.Rule 36.3). Indeed, the *Stepp* Court explicitly noted the lack of an established standard but sidestepped the issue, simply stating that "[w]hatever may constitute a hostile work environment under § 1983, two specific instances do not." 13 F.3d 407, 1993 WL 498172, at *2.

The rationale apparently underlying hostile work environment claims under § 1983 is

**18.** In *Starrett,* the Court found an Equal Protection violation without stating whether it was applying the Title VII hostile work environment standard or a different one. 876 F.2d at 815. The *Woodward* Court did not articulate an Equal Protection hostile work environment standard because it concluded that none of the defendants

in that case could be a liable: the harassing coworkers were not liable because it was not clearly established that they were acting under color of state law, 977 F.2d at 1401, and the supervisors were not liable because there was no evidence of personal direction or knowledge and acquiescence, *id.* at 1399.

that state employers deny the equal protection of the laws by creating a working environment offensive to women but not to men. *See Bohen,* 799 F.2d at 1185. Accordingly, several courts have looked to Title VII standards to determine whether the working environment was hostile. *See, e.g., Pontarelli v. Stone,* 930 F.2d 104, 112 n. 14 (1st Cir. 1991); *Trautvetter v. Quick,* 916 F.2d 1140, 1149 (7th Cir.1990). The *Bohen* court, however, appeared hesitant to import Title VII's standards in their entirety, noting that those standards focus on the terms and conditions of employment rather than differential treatment. 799 F.2d at 1187.

■ Whatever standard ultimately emerges, the Court believes that it will be no less exacting than that employed under Title VII. Because the Court is not prepared at this time to rule that the alleged discriminatory intimidation, ridicule and insults were insufficiently severe or pervasive, *see Harris v. Forklift Systems, Inc.,* ── U.S. ──, ──, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (reaffirming Title VII standard), the Court proceeds as if plaintiffs have sufficiently alleged a hostile work environment under § 1983.[19]

### a. *Carney and Castillo*

■ Plaintiffs plainly allege that Carney and Castillo engaged in the conduct which created the allegedly hostile work environment. Carney and Castillo, however, have no § 1983 liability for the alleged sexual and racial harassment of plaintiffs because, as plaintiffs' co-workers, any such conduct by them did not occur under color of state law. *See Woodward,* 977 F.2d at 1400. While the Tenth Circuit stopped short of stating that the sexual harassment of co-workers could never be perpetrated under color of state law, the circumstances of this case demonstrate that the conduct of Carney and Castillo was not predicated on the use of state authority or position but was instead the acts of private persons. *Id.* at 1401. Summary judgment is therefore warranted on these claims.

### b. *Lynch and Ladd*

■ Lynch and Ladd also are entitled to summary judgment on plaintiffs' claims for racial and sexual harassment. Plaintiffs do not allege that Lynch or Ladd engaged in any conduct which constituted a racially or sexually hostile work environment, and the Court finds no such evidence in the record. In addition, plaintiffs identify no evidence in the record that Lynch or Ladd personally directed Carney and Castillo's conduct or that they failed to curb that conduct when it became known. To the contrary, the record evidence is that Ladd and Lynch responded to plaintiffs' complaints in a timely and reasonable manner. The record discloses no evidence to support plaintiffs' conclusory allegation that the investigation of the problems of the D.A.R.E. unit was a whitewash. Finding no evidence of any deliberate deprivation of plaintiffs' constitutional rights by Lynch and Ladd, they are entitled to qualified immunity and the Court grants summary judgment on these claims.

### c. *Scafe*

■ Because plaintiffs do not allege that Scafe ever did or said anything to plaintiffs which would create a hostile work environment, plaintiffs' claims against Scafe for § 1983 racial and sexual harassment also appear to be based on a theory of supervisory liability. Plaintiffs do not contend that Scafe instructed Carney or Castillo to engage in offensive behavior. Instead, plaintiffs seek to establish the "affirmative link" between Scafe and the alleged harassment by Carney and Castillo by alleging that Scafe was a world-class bigot who fostered an unofficial atmosphere of intolerance and discrimination. Plaintiffs' theory is unavailing.

Plaintiffs admit that the present record is devoid of evidence sufficient to establish that affirmative link—that Scafe routinely made racially and sexually offensive remarks—but once again refer to their Rule 56(f) affidavit wherein they ask the Court to defer ruling on this matter until they have had the oppor-

---

**19.** In light of the Court's determination that Title VII's well-known standards mark the outer boundaries of racial and sexual harassment under § 1983, plaintiffs cannot be heard to complain that the law did not clearly establish that their conduct was unlawful.

tunity to engage in discovery on this point. Such evidence, however, would not establish a sufficient affirmative link between Scafe and the conduct of Carney and Castillo. In effect, plaintiffs contend that Scafe is liable for what Carney and Castillo said or did because he set a bad example or was a bad role model for the officers in the Overland Park Police Department. Even if Carney and Castillo testified that they were just "following Scafe's example," plaintiffs' allegations of general bigotry, without more, do not establish that Scafe *deliberately deprived* plaintiffs of their constitutional rights.

Plaintiffs also fail to identify evidence sufficient to establish a deliberate deprivation through "knowledge and acquiescence." The record reflects that any known conduct was promptly investigated and acted upon. To the extent that plaintiffs contend that Scafe should have known that his alleged bigotry would foster harassing behavior, that claim impermissibly attempts to predicate supervisor liability on negligence. *See Woodward,* 977 F.2d at 1392. Scafe thus is entitled to qualified immunity and the Court grants summary judgment on these claims.

d. *Pipes*

 Pipes also has no liability for the alleged hostile work environment. The record is devoid of evidence that he engaged in any harassing conduct. The record also fails to establish supervisory liability. Certainly there is no evidence that he directed Carney and Castillo or that he failed to remedy their alleged actions upon learning of them. Rather, plaintiffs' claims seem to center on Pipes being liable for the conduct of his Chief of Police, Scafe. Plaintiffs allege that Pipes knew or should have known that Scafe was perpetuating a racially and sexually hostile work environment. Their only evidence for this claim, however, is the fact of his involve-

ment in the Cindy Scott case from 1984. This is simply insufficient to establish that Pipes knew or shut his eyes to incidents occurring seven years later. At most, plaintiffs allege negligence, which does not constitute a deliberate deprivation. *See Woodward,* 977 F.2d at 1399. The Court further concludes that nothing in the Round Memo or Barbour declaration constitutes specific evidence of deliberate deprivation such that summary judgment should be deferred. Thus, Pipes is entitled to qualified immunity on plaintiffs' racial and sexual harassment claims under the Fourteenth Amendment.[20]

e. *The City*

 Plaintiffs allege that there was an unofficial policy of racial and sexual discrimination at the Police Department. Plaintiffs allege that Chief Scafe was the prime source for this policy. While the present record offers scant evidence in support of this assertion, plaintiffs insist that discovery will support their claim. The City, of course, cannot claim qualified immunity, and plaintiffs may yet be able to establish an underlying violation. In light of plaintiffs' Rule 56(f) affidavit, the Court is inclined to let discovery run its course with respect to their contention that their harassment was the result of an unofficial policy of intolerance and discrimination.

4. *Constructive Discharge*

Finally, Jones alleges a § 1983 violation based on constructive discharge. Jones' supervisor at Patrol was Major John Douglass. In January 1992, Douglass learned that Jones believed the earlier problems she had had with Carney were resurfacing. A subsequent investigation performed by Douglass and Lt. Jeffrey Dysart failed to corroborate her complaints beyond what had been report-

---

**20.** Because the Court concludes that none of the "qualified immunity" defendants deliberately deprived plaintiffs of their rights, the Court need not inquire into the objective reasonableness of their actions. It is unclear, however, how *Harlow*'s objective reasonableness standard would apply to a sexual harassment claim under § 1983. To prevail on a claims under the Fourteenth Amendment, plaintiff must establish intent. Thus, the two-step analysis outlined in *Pueblo* and *Lewis* would seem to apply when

qualified immunity is asserted. Where the record indicates that a person created or acquiesced in a hostile work environment, the Court is not sure how the person would establish that their conduct was objectively reasonable. In addition, most decisions appear to presume that the harassment was impermissibly motivated unless the evidence establishes some other motive. *See Trautvetter,* 916 F.2d at 1151 (personal animus independent of gender); *Stafford,* 835 F.Supp. at 1141 (same).

ed during the earlier D.A.R.E. investigation, and Jones specifically asked that they not investigate her allegations that certain other officers had used the word "nigger" six years earlier. Meanwhile, Douglass had learned that Jones was considering another position within the City and assured her that her concerns about discrimination and harassment were being considered. Shortly thereafter, in March 1992, Jones sought and received a voluntary transfer to the Community Services Department of the City of Overland Park.

 A constructive discharge exists when working conditions become so difficult that a reasonable person would feel compelled to resign. *See Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986). Jones nowhere specifies what occurred to make her feel that her earlier problems with Carney were resurfacing. Instead, Jones appears to base her constructive discharge claim on her belief that the Department conducted yet another "cover-up" investigation. Jones, however, offers no evidence whatsoever indicating that the Patrol investigation was anything other than legitimate. Thus, the Court cannot conclude that a claim for constructive discharge accrues to an employee who feels—without any articulable basis—that her employer is not taking her complaints seriously. The Court therefore grants summary judgment to all defendants on Jones' § 1983 claim based on her alleged constructive discharge.

## V. *Section 1981*

Plaintiff Jones asserts claims under 42 U.S.C. § 1981 against defendants Scafe, Pipes, Lynch, Ladd, and the City based on (1) her July 9, 1991, Letter of Reprimand; (2) her August 11, 1991, transfer to Patrol; and (3) her alleged constructive discharge in March, 1992. Defendants deny any violation, and the individual defendants assert the defense of qualified immunity.

 The Court must first consider which claims may properly be brought under § 1981. In *Patterson v. McLean Credit Un-*

ion, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court limited the scope of § 1981, stating that the right to make and enforce contracts "covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce the contract obligations through legal process." *Id.* at 179, 109 S.Ct. at 2374. So construed, § 1981 affords no redress for discriminatory discharge, *see Trujillo v. Grand Junction Regional Ctr.,* 928 F.2d 973, 975–76 (10th Cir.1991), for the existence of a racially hostile work environment, *see Patterson,* 491 U.S. at 177–78, 109 S.Ct. at 2373, or for retaliating against an employee who complains of racial harassment, *see Hill v. Goodyear Tire & Rubber, Inc.,* 918 F.2d 877, 880 (10th Cir.1990). The Supreme Court recently held that § 101 of the Civil Rights Act of 1991, which effectively overruled *Patterson*'s restrictions, does not apply to cases which arose prior to its enactment on November 21, 1991. *Rivers v. Roadway Express, Inc.,* —— U.S. ——, ——–——, 114 S.Ct. 1510, 1519–20, 128 L.Ed.2d 274 (1994). Thus, for any acts which occurred exclusively before November 21, 1991, the Court must determine whether those acts involved Jones's right to make or enforce contracts as interpreted by *Patterson* and its progeny. Clearly, Jones's claims based on the letter of reprimand and her transfer out of D.A.R.E. concern post-formation conduct which itself is not actionable under § 1981.

The only remaining conduct complained of is Jones' alleged constructive discharge. The Court, however, already has concluded that Jones has failed to plead facts sufficient to sustain a conclusion that the working conditions were so intolerable that she was forced to resign. The Court therefore enters judgment for all defendants on Jones' claims brought under § 1981.

## VI. *Section 1985(3)*

Plaintiffs allege that the individual defendants conspired to deprive them of their rights protected by the First and Fourteenth Amendments [21] in violation of 42 U.S.C.

---

**21.** As with their § 1983 claims, plaintiffs state claims under § 1985(3) based on what appears to be alleged Title VII violations. Title VII viola-

tions, however, will not support a claim under § 1985(3). *Great Am. Fed. Savs. & Loan Ass'n v. Novotny,* 442 U.S. 366, 378, 99 S.Ct. 2345, 2352,

§ 1985(3). Defendants deny any violations or the existence of a conspiracy, and the individual defendants assert the defense of qualified immunity.

■ Section 1985(3) does not in itself create any substantive rights. *Gallegos,* 984 F.2d at 362. It merely grants an avenue of relief to a plaintiff who has been deprived of an existing constitutional or federal statutory right. *Id.* Thus, recovery under a § 1983 conspiracy theory requires the plaintiff to "plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient." *Dixon v. City of Lawton,* 898 F.2d 1443, 1449 (10th Cir.1990). Because a grant of qualified immunity based on objective reasonableness is the equivalent of a ruling on the merits, *see Hinton,* 997 F.2d at 783, a defendant who asserts the defense of qualified immunity and establishes that his or her actions were objectively reasonable cannot be held liable for an alleged conspiracy based on those acts. *See Pfannstiel v. City of Marion,* 918 F.2d 1178, 1187 (5th Cir.1990); *see also Gehl Group v. Koby,* 838 F.Supp. 1409, 1419 (D.Colo.1993).

In this case, the Court has concluded that no constitutional violation resulted from the letters of reprimand or the transfers. Carney and Castillo did not take those actions; Scafe, Pipes, Lynch, and Ladd established the objective reasonableness of their conduct. The Court therefore grants summary judgment for all defendants on plaintiffs' conspiracy claims with respect to the letters of reprimand and the transfers. Remaining for consideration, then, is whether a conspiracy existed with respect to plaintiffs' allegations of racial and sexual harassment.

■ A § 1985(3) claim requires proof of a conspiracy motivated by a class-based invidiously discriminatory animus. *See Dixon,* 898 F.2d at 1447. The Court acknowledges that plaintiffs often must prove conspiracies with circumstantial evidence. In this case, however, plaintiffs offer no evidence—direct or circumstantial—which war-

rants the inference of a discriminatory agreement to harass plaintiffs. Rather, plaintiffs appear to ask the Court to accept their conclusory allegations of conspiracy on a "common sense" basis, an approach recently condemned by the Tenth Circuit. *See Gallegos,* 984 F.2d at 364. Furthermore, the Court finds nothing in the Round Memo which would warrant discovery on the conspiracy claims. While it purports to catalog offensive comments by Scafe, it nowhere references any conduct of the other defendants or any agreement to harass plaintiffs. The Court therefore grants summary judgment to all defendants on plaintiffs' conspiracy claims.

**IT IS THEREFORE ORDERED** that *Defendants' Restated Motion for Summary Judgment Against Geraldine Jones* (Doc. # 52) (Case No. 92–2162–KHV) and *Defendants' Restated Motion for Summary Judgment Against Angela Redpath* (Doc. # 50) (Case No. 92–2163–KHV) be and hereby are OVERRULED as to plaintiffs' Title VII claims against the City and plaintiffs' § 1983 racial and sexual harassment claims against the City and are **SUSTAINED** in all other respects.

**IT IS FURTHER ORDERED** that all prior restrictions on discovery be and hereby are lifted and that the parties proceed with preparation for trial on the docket beginning August 16, 1994.

**IT IS SO ORDERED.**

60 L.Ed.2d 957 (1979); *see also Drake v. City of Fort Collins,* 927 F.2d 1156, 1162 (10th Cir. 1991).